# FEDERAL TRADE COMMISSION *v.* MORTON SALT CO.

No. 464.   Argued March 10, 1948.—Decided May 3, 1948.

38

*Robert L. Stern* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett* and *W. T. Kelley.*

*Lloyd M. McBride* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The Federal Trade Commission, after a hearing, found that the respondent, which manufactures and sells table salt in interstate commerce, had discriminated in price between different purchasers of like grades and qualities, and concluded that such discriminations were in violation

of § 2 of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13.[1] It accordingly issued a cease and desist order. 39 F. T. C. 35.[2] Upon petition of the respondent the Circuit Court of Appeals, with one judge dissenting, set aside the Commission's findings and order, directed the Commission to dismiss its complaint against respondent, and denied a cross petition of the Commission for enforcement of its order. 162 F. 2d 949. The Court's judgment rested on its construction of the Act, its holding that crucial findings of the Commission were either not supported by evidence or were contrary to the evidence, and its conclusion that the Commission's order was too broad. Since questions of importance in the construction and administration of the Act were presented, we granted certiorari. 332 U. S. 850. Disposition of these questions requires only a brief narration of the facts.

Respondent manufactures several different brands of table salt [3] and sells them directly to (1) wholesalers or

---

[1] Section 2 (a) provides in part: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

[2] The original findings and order were modified by the Commission on its own motion. The controversy here deals only with the findings and order as modified.

[3] Respondent also produces and sells other kinds of salt, but the trade practices here involved only relate to table salt.

jobbers, who in turn resell to the retail trade, and (2) large retailers, including chain store retailers. Respondent sells its finest brand of table salt, known as Blue Label, on what it terms a standard quantity discount system available to all customers. Under this system the purchasers pay a delivered price and the cost to both wholesale and retail purchasers of this brand differs according to the quantities bought. These prices are as follows, after making allowance for rebates and discounts:

|  | *Per case* |
|---|---|
| Less-than-carload purchases | $1.60 |
| Carload purchases | 1.50 |
| 5,000-case purchases in any consecutive 12 months | 1.40 |
| 50,000-case purchases in any consecutive 12 months | 1.35 |

Only five companies have ever bought sufficient quantities of respondent's salt to obtain the $1.35 per case price. These companies could buy in such quantities because they operate large chains of retail stores in various parts of the country.[4] As a result of this low price these five companies have been able to sell Blue Label salt at retail cheaper than wholesale purchasers from respondent could reasonably sell the same brand of salt to independently operated retail stores, many of whom competed with the local outlets of the five chain stores.

Respondent's table salts, other than Blue Label, are also sold under a quantity discount system differing slightly from that used in selling Blue Label. Sales of these other brands in less-than-carload lots are made at list price plus freight from plant to destination. Carload purchasers are granted approximately a 5 per cent discount; approximately a 10 per cent discount is granted to purchasers who buy as much as $50,000 worth of all brands of salt in any consecutive twelve-month period.

---

[4] These chain stores are American Stores Company, National Tea Company, Kroger Grocery Co., Safeway Stores, Inc., and Great Atlantic & Pacific Tea Company.

Respondent's quantity discounts on Blue Label and on other table salts were enjoyed by certain wholesalers and retailers who competed with other wholesalers and retailers to whom these discounts were refused.

In addition to these standard quantity discounts, special allowances were granted certain favored customers who competed with other customers to whom they were denied.[5]

*First.* Respondent's basic contention, which it argues this case hinges upon, is that its "standard quantity discounts, available to all on equal terms, as contrasted, for example, to hidden or special rebates, allowances, prices or discounts, are not discriminatory within the meaning of the Robinson-Patman Act." Theoretically, these discounts are equally available to all, but functionally they are not. For as the record indicates (if reference to it on this point were necessary) no single independent retail grocery store, and probably no single wholesaler, bought as many as 50,000 cases or as much as $50,000 worth of table salt in one year. Furthermore, the record shows that, while certain purchasers were enjoying one or more of respondent's standard quantity discounts, some of

---

[5] One such customer, a wholesaler, received a special discount of 7½ cents per case on purchases of carload lots of Blue Label Salt. Respondent sold to this wholesaler at $1.42½ per case, although competing wholesalers were required to pay $1.50 per case on carload lots. The Circuit Court of Appeals held that findings of the Commission on these special allowances were supported by substantial evidence, that they were not maintained to meet lower prices of respondent's competitors, and that the allowances were discriminatory. It nevertheless set the findings aside on the ground that the Commission's finding of injury to competition from the discriminations engaged in by respondent was too general and had little evidence to support it. We think the finding and supporting evidence of injury to competition on account of these special allowances are similar to the finding and evidence with reference to the quantity discount system and need not be separately treated.

their competitors made purchases in such small quantities that they could not qualify for any of respondent's discounts, even those based on carload shipments. The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

Section 2 of the original Clayton Act had included a proviso that nothing contained in it should prevent "discrimination in price . . . on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation . . . ." That section has been construed as permitting quantity discounts, such as those here, without regard to the amount of the seller's actual savings in cost attributable to quantity sales or quantity deliveries. *Goodyear Tire & Rubber Co.* v. *Federal Trade Comm'n,* 101 F. 2d 620. The House Committee Report on the Robinson-Patman Act considered that the Clayton Act's proviso allowing quantity discounts so weakened § 2 "as to render it inadequate, if not almost a nullity." [6] The Committee considered the present Robinson-Patman amendment to § 2 "of great importance." Its purpose was to limit "the use of quantity price differentials to the sphere of actual cost differences. Otherwise," the report continued, "such differentials would become instruments of favor and privilege and weapons of com-

---

[6] H. R. Rep. No. 2287, 74th Cong., 2d Sess. 7.

petitive oppression." [7]   The Senate Committee reporting
the bill emphasized the same purpose,[8] as did the Con-
gressman in charge of the Conference Report when ex-
plaining it to the House just before final passage.[9]   And
it was in furtherance of this avowed purpose—to protect
competition from all price differentials except those based
in full on cost savings—that § 2 (a) of the amendment
provided "That nothing herein contained shall prevent
differentials which make only due allowance for differ-
ences in the cost of manufacture, sale, or delivery
resulting from the differing methods or quantities in
which such commodities are to such purchasers sold or
delivered."

The foregoing references, without regard to others
which could be mentioned, establish that respondent's
standard quantity discounts are discriminatory within,
the meaning of the Act, and are prohibited by it whenever
they have the defined effect on competition.   See *Federal
Trade Comm'n* v. *Staley Co.*, 324 U. S. 746, 751.

*Second.* The Government interprets the opinion of the
Circuit Court of Appeals as having held that in order to
establish "discrimination in price" under the Act the bur-
den rested on the Commission to prove that respondent's
quantity discount differentials were not justified by its
cost savings.[10]   Respondent does not so understand the
Court of Appeals decision, and furthermore admits that
no such burden rests on the Commission.   We agree that
it does not.   First, the general rule of statutory construc-
tion that the burden of proving justification or exemption
under a special exception to the prohibitions of a statute

---

[7] *Id.* at 9.

[8] Sen. Rep. No. 1502, 74th Cong., 2d Sess. 4–6.

[9] 80 Cong. Rec. 9417.

[10] See 42 Ill. L. Rev. 556–561; 15 U. of Chi. L. Rev. 384–391; 60
Harv. L. Rev. 1167–1169.

generally rests on one who claims its benefits,[11] requires that respondent undertake this proof under the proviso of § 2 (a). Secondly, § 2 (b) of the Act specifically imposes the burden of showing justification upon one who is shown to have discriminated in prices. And the Senate committee report on the bill explained that the provisos of § 2 (a) throw "upon any who claim the benefit of those exceptions the burden of showing that their case falls within them."[12] We think that the language of the Act, and the legislative history just cited, show that Congress meant by using the words "discrimination in price" in § 2 that in a case involving competitive injury between a seller's customers the Commission need only prove that a seller had charged one purchaser a higher price for like goods than he had charged one or more of the purchaser's competitors.[13] This construction is consistent with the first sentence of § 2 (a) in which it is made unlawful "to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be . . . to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ."

*Third.* It is argued that the findings fail to show that respondent's discriminatory discounts had in fact caused

---

[11] *Javierre* v. *Central Altagracia,* 217 U. S. 502, 507–508 and cases cited.

[12] Sen. Rep. No. 1502, 74th Cong., 2d Sess. 3. See also 80 Cong. Rec. 3599, 8241, 9418.

[13] See *Moss, Inc.* v. *Federal Trade Comm'n,* 148 F. 2d 378, 379, holding that proof of a price differential in itself constituted "discrimination in price," where the competitive injury in question was between sellers. See also *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 721–726.

injury to competition. There are specific findings that such injuries had resulted from respondent's discounts, although the statute does not require the Commission to find that injury has actually resulted. The statute requires no more than that the effect of the prohibited price discriminations "may be substantially to lessen competition . . . or to injure, destroy, or prevent competition." After a careful consideration of this provision of the Robinson-Patman Act, we have said that "the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect." *Corn Products Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, 742.[14] Here the Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods

---

[14] This language is to be read also in the light of the following statement in the same case, discussing the meaning of § 2 (a), as contained in the Robinson-Patman Act, in relation to § 3 of the Clayton Act:

"It is to be observed that § 2 (a) does not require a finding that the discriminations in price have in fact had an adverse effect on competition. The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. It is enough that they 'may' have the prescribed effect. Cf. *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346, 356–357. But as was held in the *Standard Fashion* case, *supra,* with respect to the like provisions of § 3 of the Clayton Act, prohibiting tying clause agreements, the effect of which 'may be to substantially lessen competition,' the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition." 324 U. S. at 738; see also *United States* v. *Lexington Mill Co.,* 232 U. S. 399, 411.

The Committee Reports and Congressional debate on this provision of the Robinson-Patman Act indicate that it was intended to have a broader scope than the corresponding provision of the old Clayton Act. See note 18 *infra.*

than their competitors had to pay. The findings are adequate.

*Fourth.* It is urged that the evidence is inadequate to support the Commission's findings of injury to competition.[15] As we have pointed out, however, the Commission is authorized by the Act to bar discriminatory prices upon the "reasonable possibility" that different prices for like goods to competing purchasers may have the defined effect on competition.[16] That respondent's quantity discounts did result in price differentials between competing purchasers sufficient in amount to influence their resale prices of salt was shown by evidence. This showing in itself is adequate to support the Commission's appropriate findings that the effect of such price discriminations "may be substantially to lessen competition . . . and to injure, destroy, and prevent competition."

The adequacy of the evidence to support the Commission's findings of reasonably possible injury to competition from respondent's price differentials between competing carload and less-than-carload purchasers is singled out for special attacks here. It is suggested that in considering the adequacy of the evidence to show injury to competition respondent's carload discounts and its other

---

[15] After discussing all of respondent's discriminations, the Commission stated: "The Commission finds that the effect of the discriminations in price, including discounts, rebates, and allowances, generally and specifically described herein may be substantially to lessen competition in the line of commerce in which the purchaser receiving the benefit of said discriminatory price is engaged and to injure, destroy, and prevent competition between those purchasers receiving the benefit of said discriminatory prices, discounts, rebates, and allowances and those to whom they are denied."

[16] The statute outlaws any discrimination the effect of which "may be substantially to lessen competition . . . or to injure . . . competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ."

quantity discounts should not be treated alike. The argument is that there is an obvious saving to a seller who delivers goods in carload lots. Assuming this to be true, that fact would not tend to disprove injury to the merchant compelled to pay the less-than-carload price. For a ten-cent carload price differential against a merchant would injure him competitively just as much as a ten-cent differential under any other name. However relevant the separate carload argument might be to the question of justifying a differential by cost savings, it has no relevancy in determining whether the differential works an injury to a competitor. Since Congress has not seen fit to give carload discounts any favored classification we cannot do so. Such discounts, like all others, can be justified by a seller who proves that the full amount of the discount is based on his actual savings in cost. The trouble with this phase of respondent's case is that it has thus far failed to make such proof.

It is also argued that respondent's less-than-carload sales are very small in comparison with the total volume of its business [17] and for that reason we should reject the Commission's finding that the effect of the carload discrimination may substantially lessen competition and may injure competition between purchasers who are granted and those who are denied this discriminatory discount. To support this argument, reference is made to the fact

---

[17] Respondent introduced testimony and exhibits intended to show that only one-tenth of one per cent of its sales were made at less-than-carload prices. It appears that this figure relates only to a single one-year period and was obtained by lumping together statistics on respondent's sales of table salt along with those on sales of its other products, such as salt tablets, coarse rock salt, and sal soda. Since this proceeding is concerned only with discounts on table salts, these figures are of dubious value. Furthermore, they are limited to sales in respondent's Chicago area, whereas respondent carried on a nation-wide business.

that salt is a small item in most wholesale and retail businesses and in consumers' budgets. For several reasons we cannot accept this contention.

There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect a merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the particular goods constituted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store.

Furthermore, in enacting the Robinson-Patman Act, Congress was especially concerned with protecting small businesses which were unable to buy in quantities, such as the merchants here who purchased in less-than-carload lots. To this end it undertook to strengthen this very phase of the old Clayton Act. The committee reports on the Robinson-Patman Act emphasized a belief that § 2 of the Clayton Act had "been too restrictive, in requiring a showing of general injury to competitive conditions . . . ." The new provision, here controlling, was intended to justify a finding of injury to competition by a showing of "injury to the competitor victimized by the discrimination." [18] Since there was evidence sufficient to

---

[18] In explaining this clause of the proposed Robinson-Patman Act, the Senate Judiciary Committee said:

"This clause represents a recommended addition to the bill as referred to your committee. It tends to exclude from the bill otherwise harmless violations of its letter, but accomplishes a substantial broadening of a similar clause now contained in section 2 of the Clayton Act. The latter has in practice been too restrictive, in requiring a showing of general injury to competitive conditions in the line of commerce concerned; whereas the more immediately important concern is in injury to the competitor victimized by the

show that the less-than-carload purchasers might have been handicapped in competing with the more favored carload purchasers by the differential in price established by respondent, the Commission was justified in finding that competition might have thereby been substantially lessened or have been injured within the meaning of the Act.

Apprehension is expressed in this Court that enforcement of the Commission's order against respondent's continued violations of the Robinson-Patman Act might lead respondent to raise table salt prices to its carload purchasers. Such a conceivable, though, we think, highly improbable, contingency, could afford us no reason for upsetting the Commission's findings and declining to direct compliance with a statute passed by Congress.

The Commission here went much further in receiving evidence than the statute requires. It heard testimony from many witnesses in various parts of the country to show that they had suffered actual financial losses on account of respondent's discriminatory prices. Experts were offered to prove the tendency of injury from such prices. The evidence covers about two thousand pages, largely devoted to this single issue—injury to competition. It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a "reasonable possibility" that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers. This showing in itself is sufficient to justify our conclusion

discrimination. Only through such injuries, in fact, can the larger general injury result, and to catch the weed in the seed will keep it from coming to flower." S. Rep. No. 1502, 74th Cong., 2d Sess. 4. See also H. R. Rep. No. 2287, 74th Cong., 2d Sess. 8; 80 Cong. Rec. 9417.

that the Commission's findings of injury to competition were adequately supported by evidence.

*Fifth.* The Circuit Court of Appeals held, and respondent here contends, that the order was too sweeping, that it required the respondent to "conduct its business generally at its peril," and that the Commission had exceeded its jurisdiction in entering such an order.[19]  Reliance for this contention chiefly rests on *Labor Board* v. *Express Publishing Co.*, 312 U. S. 426.  That case held that the Labor Board could not broadly enjoin violations of all the provisions of the statute merely because a single violation of one of the Act's many provisions had been found. *Id.* at 435–436.  But it also pointed out that the Labor Board, "Having found the acts which constitute the unfair labor practice . . . is free to restrain the practice and other like or related unlawful acts."  It there pointed out that this Court had applied a similar rule to a Federal Trade Commission order in *Federal Trade Comm'n* v. *Beech-Nut Co.*, 257 U. S. 441, 455.  In the latter case the

---

[19] The prohibiting paragraphs of the order were:

"(a)  By selling such products to some wholesalers thereof at prices different from the prices charged other wholesalers who in fact compete in the sale and distribution of such products; provided, however, that this shall not prevent price differences of less than five cents per case which do not tend to lessen, injure, or destroy competition among such wholesalers.

"(b)  By selling such products to some retailers thereof at prices different from the prices charged other retailers who in fact compete in the sale and distribution of such products; provided, however, that this shall not prevent price differences of less than five cents per case which do not tend to lessen, injure, or destroy competition among such retailers.

"(c)  By selling such products to any retailer at prices lower than prices charged wholesalers whose customers compete with such retailer.

"For the purposes of comparison, the term 'price' as used in this order takes into account discounts, rebates, allowances, and other terms and conditions of sale."

Court not only approved restraint of the unlawful price-fixing practices found, but "any other equivalent cooperative means of accomplishing the maintenance of prices fixed by the company." See also *May Dep't Stores Co.* v. *Labor Board,* 326 U. S. 376, 392–393. We think the Commission's order here, save for the provisos in (a) and (b) later considered, is specifically aimed at the pricing practices found unlawful, and therefore does not run counter to the holding in the *Express Publishing Co.* case. Certainly the order in its relation to the circumstances of this case is only designed "to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board [Commission] has found to have been committed by the . . . [respondent] in the past." *Labor Board* v. *Express Publishing Co., supra,* 436–437.

The specific restraints of paragraphs (a) and (b) of the order are identical, except that one applies to prices respondent charges wholesalers and the other to prices charged retailers. It is seen that the first part of these paragraphs, preceding the provisos, would absolutely bar respondent from selling its table salt, regardless of quantities, to some wholesalers and retailers at prices different from that which it charged competing wholesalers and retailers for the same grade of salt. The Commission had found that respondent had been continuously engaged in such discriminations through the use of discounts, rebates and allowances. It had further found that respondent had failed to show justification for these differences by reason of a corresponding difference in its costs. Thus the restraints imposed by the Commission upon respondent are concerned with the precise unlawful practices in which it was found to have engaged for a number of years. True, the Commission did not merely prohibit future discounts, rebates, and allowances in the exact mathematical percentages previously utilized by respondent. Had the

order done no more than that, respondent could have continued substantially the same unlawful practices despite the order by simply altering the discount percentages and the quantities of salt to which the percentages applied. Paragraphs (a) and (b) up to the language of the provisos are approved.

The provisos in (a) and (b) present a more difficult problem. They read: "provided, however, that this shall not prevent price differences of less than five cents per case which do not tend to lessen, injure, or destroy competition among such wholesalers [retailers]." The first clause of the provisos, but for the second qualifying clause, would unequivocally permit respondent to maintain price differentials of less than five cents as between competing wholesalers and as between competing retailers.[20] This clause would appear to benefit respondent, and no challenge to it, standing alone, is here raised. But respondent seriously objects to the second clause of the proviso which qualifies the permissive less-than-five-cent differentials provided in the first clause. That qualification permits such differentials only if they do "not tend to lessen, injure, or destroy competition." Respondent points out that where a differential tends in no way to injure competition, the Act permits it. "The Commission," so respondent urges, "must either find and rule that a given differential injures competition, and then prohibit it, or it must leave that differential entirely alone." Whether, and under what circumstances, if any, the Commission

---

[20] The only finding of the Commission specifically relating to five-cent differentials was: "Salt is a staple commodity with a medium turnover and is generally sold by wholesalers to their retail customers on a lower margin of profit than that received on other commodities. Consequently, the price at which the wholesaler offers his table salt is usually controlling, and a difference of five cents per case may result in the loss of a sale to a customer, not only of the salt involved but of other commodities as well, the order for which might be placed with the salt purchase."

might prohibit differentials which do not of themselves tend to injure competition, we need not decide, for the Commission has not in either (a) or (b) taken action which forbids such noninjurious differentials. But other objections raised to the qualifying clauses require consideration.

One of the reasons for entrusting enforcement of this Act primarily to the Commission, a body of experts, was to authorize it to hear evidence as to given differential practices and to make findings concerning possible injury to competition. Such findings are to form the basis for cease and desist orders definitely restraining the particular discriminatory practices which may tend to injure competition without justification. The effective administration of the Act, insofar as the Act entrusts administration to the Commission, would be greatly impaired if, without compelling reasons not here present, the Commission's cease and desist orders did no more than shift to the courts in subsequent contempt proceedings for their violation the very fact questions of injury to competition, etc., which the Act requires the Commission to determine as the basis for its order. The enforcement responsibility of the courts, once a Commission order has become final either by lapse of time or by court approval, 15 U. S. C. §§ 21, 45, is to adjudicate questions concerning the order's violation, not questions of fact which support that valid order.

Whether on this record the Commission was compelled to exempt certain differentials of less than five cents we do not decide. But once the Commission exempted the differentials in question from its order, we are constrained to hold that as to those differentials it could not then shift to the courts a responsibility in enforcement proceedings of trying issues of possible injury to competition, issues which Congress has primarily entrusted to the Commission.

This leaves for consideration the objection to paragraph (c) of the order which reads: "By selling such products to any retailer at prices lower than prices charged wholesalers whose customers compete with such retailer." The only criticism here urged to (c) is that it bars respondent from selling to a retailer at a price lower than that charged a wholesaler whose customers compete with the retailer. Section 2 (a) of the Act specifically authorizes the Commission to bar discriminatory prices which tend to lessen or injure competition with "any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." This provision plainly supports paragraph (c) of the order.

We sustain the Commission's order with the exception of the provisos in paragraphs (a) and (b) previously set out. Since the qualifying clauses constitute an important limitation to the provisos, we think the Commission should have an opportunity to reconsider the entire provisos in light of our rejection of the qualifying clauses, and to refashion these provisos as may be deemed necessary. This the Commission may do upon the present evidence and findings or it may hear other evidence and make other findings on this phase of the case, should it conclude to do so. See *Federal Trade Comm'n* v. *Royal Milling Co.*, 288 U. S. 212, 218.

The judgment of the Circuit Court of Appeals is reversed and the proceedings are remanded to that court to be disposed of in conformity with this opinion.

*Reversed.*

MR. JUSTICE JACKSON, with whom MR. JUSTICE FRANKFURTER joins, dissenting in part.

While I agree with much of the Court's opinion, I cannot accept its most significant feature, which is a new interpretation of the Robinson-Patman Act that will

sanction prohibition of any discounts if "there is a reasonable *possibility* that they 'may' have" the effect to wit: to lessen, injure, destroy or prevent competition. [Emphasis supplied.] I think the law as written by the Congress and as always interpreted by this Court requires that the record show a reasonable *probability* of that effect. The difference, as every lawyer knows, is not unimportant and in many cases would be decisive.

The law rarely authorizes judgments on proof of mere possibilities. After careful consideration this Court has, at least three times and as late as 1945, refused to interpret these laws as doing so. In 1922, in *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, at 356, a unanimous Court, construing like language in § 3 of the Clayton Act, said: "But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly."

In 1930, in *International Shoe Company* v. *Federal Trade Commission*, 280 U. S. 291, the Court said (at p. 298) with respect to identical language in § 7 of the Clayton Act: ". . . the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree, *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 357 . . ." And Mr. Justice Stone wrote for the dissenting justices (280 U. S. 306): "Nor am I able to say that the McElwain Company . . . was then in such financial straits as to preclude the reasonable inference by the Commission that its business . . . would probably continue to compete with that of petitioner. See *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 356–357."

With these interpretations on our books the Robinson-Patman Act was passed.

When the latter Act came before this Court in 1945, this same question was carefully considered and Chief Justice Stone, with the concurrence of all but two members of the Court and with no disagreement noted on this point, wrote:

"It is to be observed that § 2 (a) does not require a finding that the discriminations in price have in fact had an adverse effect on competition. The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. It is enough that they 'may' have the prescribed effect. Cf. *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346, 356–357. But as was held in the *Standard Fashion* case, *supra,* with respect to the like provisions of § 3 of the Clayton Act, prohibiting tying clause agreements, the effect of which 'may be to substantially lessen competition,' the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition." *Corn Products Company* v. *Federal Trade Commission,* 324. U. S. 726, 738.

It is true that later (324 U. S. at 742) the opinion uses the language as to possibility of injury now quoted in part[1] by the Court as the holding of that case. But the phrase appears in such form and context and is so irreconcilable with the earlier careful and complete state-

---

[1] The full text of the later reference, quoted in part by the Court, is: "As we have said, the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect. We think that it was permissible for the Commission to infer that these discriminatory allowances were a substantial threat to competition."

It seems obvious that the Court's "as we have said" refers to the earlier statement that the test is "probability" which is quoted in full above, particularly in the absence of any other citation or reference.

ment, set out above, that the inconsistency must appear to a fair reader as one of those inadvertencies into which the most careful judges sometimes fall. It is the only authority for making a thrice-rejected rule of interpretation a prevailing one. I know of no other instance in which this Court has ever held that administrative orders applying drastic regulation of business practices may hang on so slender a thread of inference.

The Court uses overtones of hostility to all quantity discounts, which I do not find in the Act, but they are translated into a rule which is fatal to any discount the Commission sees fit to attack. To say it is the law that the Commission may strike down any discount "upon the 'reasonable possibility' that different prices for like goods to competing purchasers may" substantially injure competition, coupled with the almost absolute subservience of judicial judgment to administrative experience, cf. *Securities & Exchange Commission* v. *Chenery Corp.*, 332 U. S. 194, means that judicial review is a word of promise to the ear to be broken to the hope. The law of this case, in a nutshell, is that no quantity discount is valid if the Commission chooses to say it is not. That is not the law which Congress enacted and which this Court has uniformly stated until today.

The Robinson-Patman Act itself, insofar as it relates to quantity discounts, seems to me, on its face and in light of its history, to strive for two results, both of which should be kept in mind when interpreting it.

On the one hand, it recognizes that the quantity discount may be utilized arbitrarily and without justification in savings effected by quantity sales, to give a discriminatory advantage to large buyers over small ones. This evil it would prohibit. On the other hand, it recognizes that a business practice so old and general is not without some basis in reason, that much that we call our standard of living is due to the wide availability of low-priced goods,

made possible by mass production and quantity distribution, and hence that whatever economies result from quantity transactions may, and indeed should, be passed down the line to the consumer. I think the Court's disposition of this case pretty much sanctions an obliteration of the difference between discounts which the Act would foster and those it would condemn.

It will illustrate my point to discuss only two of the discounts involved—two which the Commission and the Court lump together and treat exactly alike, but which to me require under the facts of this case quite different inferences as to their effect on competition.

In addition to a general ten-cent per case carload lot discount, there is what we may call a quota discount, by which customers who purchase 5,000 or more cases in a twelve-month period get a further rebate of 10 cents per case, while those who purchase 50,000 or more cases in such periods get an additional 5 cents per case. The application of this schedule to distribution of the table salt involved is substantially illustrated by one of the Company's exhibits, from which we find:

| Cases purchased | Number customers | Discount per case |
| --- | --- | --- |
| 1–500 | 3,643 | 0 |
| 501–4,999 | 343 | 0 |
| 5,000–10,000 | 35 | .10 |
| 10,000–49,999 | 14 | .10 |
| 50,000 and over | 5 | .15 |

It thus appears that out of approximately 4,000 customers only 54 receive either of these two quota discounts in practice, and the larger one is available to only four or five major chain store organizations. The quota discounts allowed a customer are not related to any apparent difference in handling costs but are based solely on the volume of his purchases, which in turn depends largely on the volume of his sales, and these in turn are surely

influenced by his lowered costs which he can reflect in his retail prices.

I agree that these facts warrant a *prima facie* inference of discrimination and sustain a finding of discrimination unless the Company, which best knows why and how these discounts are arrived at and which possesses all the data as to costs, comes forward with a justification. I agree, too, that the results of this system on respondent's customer list is enough to warrant the inference that the effects "may be substantially to lessen competition or tend to create a monopoly."

Even applying the stricter test of probability, I think the inference of adverse effect on competition is warranted by the facts as to the quota discounts. It is not merely probable but I think it is almost inevitable that the further ten-cent or fifteen-cent per case differential in net price of salt between the large number of small merchants and the small number of very large merchants, accelerates the trend of the former towards extinction and of the latter towards monopoly.

However, a very different problem is presented by the differential of 10 cents per case when delivered in carload lots. This carload price applies to various small purchasers who pool their orders to make a carload shipment and to all who pick up their orders, no matter how small, at the company warehouses which are maintained in ten cities. The evidence is that less than 1/10 of 1% of the respondent's total salt business fail to get the benefit of this carload-lot discount.

It does not seem to me that one can fairly draw the inference that competition *probably* is affected by the carload-lot discount. Indeed, the discount is so small in proportion to price, salt is so small an item in wholesale or retail business and in the consumer's budget that I should think it farfetched even to find it reasonably *pos-*

*sible* that competition would be *substantially* affected. Hence, the discount, whether more or less than the exact savings in handling, would not fall under condemnation of the statute. The incidence of this discount on customers is not arbitrarily determined by the volume of their business but depends upon an obvious difference in handling and delivery costs.

The Commission has forbidden respondent to continue this carload-lot differential. The Commission has no power to prescribe prices, so that it can order only that the differential be eliminated. Unless competitive conditions make it impossible, the respondent's self-interest would dictate that it abolish the discount and maintain the higher base price, rather than make the discount universally applicable. The result would be to raise the price of salt 10 cents per case to 99.9% of respondent's customers because 1/10 of 1% were not in a position to accept carload shipments. This is a quite different effect than the elimination of the quota discount.

It seems to me that a discount which gives a lowered cost to so large a proportion of respondent's customers and is withheld only from those whose conditions of delivery obviously impose greater handling costs, does not permit the same inferences of effect on competition as the quota discounts which reduce costs to the few only and that on a basis which ultimately is their size.

The two types of discount involved here seem to me to fall under different purposes of the Act and to require different conclusions of fact as to effect on competition. Accordingly, I should sustain the court below insofar as it sets aside the cease and desist order as to carload-lot discounts.