### BRUCE'S JUICES, Inc. v. AMERICAN CAN CO.

Civ. No. 569.

United States District Court
S. D. Florida, Tampa Division.
Sept. 24, 1949.

Cody Fowler, Tampa, Fla., Robert W. Shackleford, Tampa, Fla., for plaintiff.

Gerhard A. Gesell, Washington, D. C., William M. Aiken, Washington, D. C., John M. Allison, Tampa, Fla., for defendant.

BARKER, District Judge.

In this action, Bruce's Juices, Inc., a Florida corporation, which has maintained its principal cannery in the City of Tampa, Florida, since its incorporation, seeks to recover damages which it claims to have sustained as a result of the defendant's violations of Section 13 of Title 15 United States Code Annotated, now generally known as the Robinson-Patman Act.

J. Adams Bruce was a pioneer in the canning of citrus juice, entering this field in 1926, and initially he personally sold and delivered citrus juice in milk bottles. In 1928 he incorporated the plaintiff and became its President and principal stockholder, which positions he has retained. The public welcomed the time saving idea of palatable juice, ready for consumption, and the business flourished.

The defendant is the world's largest manufacturer of cans, and its average annual dollar volume of sales has exceeded $96,000,000 during the years here in controversy. It has, for many years, maintained can manufacturing plants in more than twenty states, one of said plants being located in Tampa, Florida. Also it has operated like plants in Alaska, Hawaii and Canada.

Tampa has become a center of the canning citrus juice industry and in addition to plaintiff's cannery, California Packing Corporation and Stokely Bros., among others maintained canneries in said city. Said companies, and also Libby, McNeill & Libby, The Great Atlantic & Pacific Tea Company, Hawaiian Pineapple Company and Morgan Packing Company, bought their can requirements from the defendant, under substantially identical contracts, the annual dollar volume purchases of each company amounting to millions of dollars. The purchases of several of these customers, including California Packing Corporation, exceeded $7,000,000 annually. Each of the above named companies canned, distributed and sold juice of various types, in commerce, through grocery stores, in competition with the plaintiff. Each of the named companies maintained canneries in various places throughout this country.

I am satisfied from the evidence adduced by the plaintiff—indeed no counter-availing evidence was brought forward—that the various cans which are here in question were of "like grade and quality". Proof on this issue established that the cans were all of commercial grade and quality and gave substantially identical performance. Certainly all of the cans were adapted for the function for which they were sold and purchased, to wit, as containers of juice, and they were "the same kind of goods".[1]

The proof establishes and indeed the court will take judicial knowledge that all fruit and vegetable juices sold through grocery stores are competitive with each other. Likewise the evidence has established that defendant's customers mentioned in this opinion were in competition with the plaintiff inasmuch as each of said companies packed their juices in defendant's cans and sold same—in open rivalry—in the same markets during relevant periods of time. To labor this point would be but to confuse the obvious.

Consideration of the entire record convinces me that the defendant's transgres-

1. U. S. v. Wallace, 116 U.S. 398, 6 S.Ct. 408, 29 L.Ed. 675, 676; F. T. C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; Braren v. Horner, 18 C.C.P.A., Patents, 971, 47 F.2d 358; McWhirter v. Monroe Calculating Mach. Co., D.C.Mo., 76 F.Supp. 465; Jones v. H. D. & J. K. Crosswell Inc., 4 Cir., 60 F.2d 827; Van Camp & Sons v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060; Toulmin's "Trade Agreements & Anti-Trust Laws", page 282; Michigan Law Review, Vol. 46, page 450 at 456, and Michigan Law Review, Vol. 35, page 708.

sions of the Act of necessity did have an adverse affect upon competition.[2]

It stands admitted, that under the system employed by the defendant, prior to the passage of the Robinson-Patman Act, that the same favored customers receiving discounts ranging as high as 14%. The fundamental purpose of the Congress[3] in amending the Clayton Act, 38 Stat. 730, was to abrogate the very practice which defendant was at that time routinely pursuing. I can reach no other conclusion than that the quantity discount system which the defendant subsequently adopted was motivated by defendant's keen desire to retain the accounts and good will of its largest customers. It sought to, and in fact did, achieve this purpose by continuing said customers in a favored discount position. The provisions of the discount schedule adopted by defendant allowed a 5% discount to such of its customers as were able to and did purchase cans in excess of $7,000,000 annually; those whose purchases were between $500,000 and $7,-000,000 received a sliding scale of discounts from 1% to 5%, whereas the financial status and needs of substantially all of defendant's customers prevented them from purchasing more than $500,000 annually, and thus precluded them from receiving any discount.

The brackets contained in the schedule are such as to infect it with the vice of too "broad averaging". The defendant of necessity argues that the discounts allowed to its customers were in fact justified in actual savings in cost of sales, it being admitted that same could not be justified upon the ground of savings in either the cost of manufacture or of delivery.

Defendant's own records, as well as the testimony of its officers, demonstrate that in actuality the defendant did not even follow the brackets or provisions of its schedule, but that on the contrary, its customers were divided and classified into merely three groups which it desig-

nated "A", "B" and "C". In the "A" group fell those whose purchases amounted to or exceeded $7,000,000; in the "B" group were placed customers whose purchases ran from $500,000 to $6,999,999, while in the "C" group fell the vast majority of customers whose annual purchases were below $500,000. Thus in practice, defendant's classification of its customers was bottomed merely on the dollar volume of their purchases and the classification bore little or no relation to the actual cost of selling. The end result of defendant's discount system, as it was operated, thus appears from the record: 98% of defendant's customers failed to qualify for any discount; of the 2% which received a discount, only three qualified for the 5% discount in any one of the years here in question. The evidence warrants no other conclusion than that the cost of selling was not proportioned or allocated by customers or even by plants, but was arbitrarily made and favored a few large customers.

Realizing the burden placed upon it by the Act, the defendant has sought to justify its system by urging on the court that it charged or allocated each of the various classes of its customers certain expenses which it contends were incurred by that class. This contention cannot prevail as it is evident to me that the plan followed by the defendant completely disregarded the actual expense incident to selling its individual customers.

As an example of the manner in which this scheme actually functioned, I note that in Florida commission charges were allocated to the Class "C" customers, those who received no discount, notwithstanding that no commissions whatsoever were incurred in this state.

A further example is disclosed by defendant's Exhibit A-28 wherein it appears that in 1940 it cost $7.02 to sell $100 worth of merchandise to a "C" customer—the

2. F. T. C. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, 1 A.L.R. 2d 260; Corn Products Ref. Co. v. F. T. C., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, 1334.

3. Dwight Patman's treatise on the Robinson-Patman Act, page 293.

smaller purchaser—and only 57¢ to sell an "A" customer—the largest purchasers.

I can not see how judicial sanction can be given to a plan which disregarded all particular transactions and ignored the actual cost of serving individual customers. Inasmuch as defendant's records demonstrate that only a fractional percentage of its customers has ever been able to qualify for even the minimum discount, I see no escape from the conclusion that the defendant has completely failed to carry the burden resting upon it of justifying the price discrimination resultant from the allowance of the discounts.

In view of the fact that only a fractional percent of defendant's customers were at any time able to reach the lowest rung of the discount ladder, the following observation of Mr. Justice Black in Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 826, 92 L.Ed. 1196, 1 A.L.R.2d 260, is peculiarly apposite: "Theoretically, these discounts are equally available to all, but functionally they are not."

The further announcements of the court in said opinion clearly condemn defendant's discount system.[4]

An additional and compelling reason for my condemnation of defendant's discount plan is that the discounts actually allowed were based upon the aggregate purchases of its nationwide customers rather than upon orders filled from a single plant. It is clear that such plan does not—indeed

could not—accurately reflect actual differences in cost of selling individual customers. Under defendant's system, it was impossible for any small customer to escape his discriminatory classification, irrespective of the degree of efficiency accomplished in the operation of his plant.[5]

■ The proof discloses that the canning business is one of volume and of short profit, that the cost of containers represents a large percentage of the total cost of the finished product. The right which was extended to customers to pool their purchases made for their widely scattered plants in determining the volume of their purchases enabled said favored few to secure discounts. Thus with the exception of a mere handful, all of defendant's purchasers were placed in an economic straitjacket from which escape could be accomplished only by a miraculous increase in their needs and purchasing power. Such a system is violative of the essential and fundamental purpose which the Congress had in mind, i. e., that a lower price could be granted only in the event it could be shown to have resulted from an actual savings in cost.[6]

Defendant urgently insists that even though this court is of the opinion that a discriminatory lower price was granted and paid to plaintiff's competitors than allowed plaintiff, that such fact would not entitle the plaintiff to a money judgment. Defendant grounds its position upon the alleged failure of the plaintiff to establish

4. "The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price."

5. Plaintiff's purchases from defendant's plant in Tampa exceeded the purchases of California Packing Corporation and Stokely Bros. from their respective

Tampa plants in every year except 1941. The plaintiff received a discount of 1% in one year and no discount in any other year. California Packing received a 5% discount each year and Stokely received discounts ranging from 3% to 5%. It was admitted that these discounts were available to plaintiff's competitors only by aggregating or pooling purchases made for their plants elsewhere. Defendant's Answers to Interrogatories 103, 106, 121, 124, Plaintiff's Ex. 36, and Rec. 1696.

6. Corn Products Ref. Co. v. F. T. C., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320; F. T. C. v. Cement Institute, 333 U.S. 693, 68 S.Ct. 793, 92 L.Ed. 1010; F. T. C. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338.

that it had sustained special injury and damage from the granting of the lower price. I find the proof to the contrary. Moreover, I am not in accord with defendant's contention which, in my opinion, is contrary to the rule of reason, as well as the recent trend of judicial thought. I am in full accord with the inference resulting from the searching question posed by Mr. Justice Jackson during the oral argument of the Morton Salt case: "If you sell salt to a one-horse grocer for $1.50 and sell it to the A & P on the opposite corner for $1.35, how can you have a difference of that kind that doesn't hurt?"[7] Also I am impressed by his further statement: "A fellow who has got to pay more, has got less left—less in profit, less to carry on the business". Here admittedly a small canner has paid more for his merchandise than has his larger competitor. The price differential was clearly available to the large competitor for innumerable competitive, and therefore harmful, purposes and of necessity the small canner, who has paid more, has thereby sustained direct injury. Argument to the contrary is but to say that a lower price is not beneficial.

My conclusion that proof of special damage is not essential to recovery finds support in the announcements of the Supreme Court in the case of Bruce's Juices, Inc. v. American Can Company, 330 U.S. 743, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219.[8] The principle of "general damage" is likewise supported by numerous well reasoned decisions.[9] Thus I am convinced that defendant's quantity discount system and the lower prices granted thereunder

to plaintiff's competitors which were not received by plaintiff was violative of the Act and occasioned actual injury and dollar damage to the plaintiff.

Plaintiff next charges that it was injured and damaged as the result of the defendant granting a discriminatory runway allowance to one of Bruce's Juices' competitors in both the grocery and IS-CAN field. The Morgan Packing Company was connected with the plant of the defendant by means of a runway. Discounts were allowed on the theory that cans would be transported to the cannery by means of this runway without the necessity of being shipped, thereby saving transportation costs. It is admitted by the defendant that there can be no savings if the cans had to be shipped. Although Morgan Packing Company bought a substantial amount of cans, which were manufactured in other plants of the defendant and were transported by rail to the cannery of the Morgan Packing Company, yet on these cans defendant gave Morgan Packing Company the runway allowance, which was substantial, and also allowed a quantity discount upon the purchases of this company before deducting this allowance. Certainly this was a discrimination in favor of Morgan Packing Company which resulted in substantial damage to the plaintiff.

About 1937 plaintiff decided to sell juice in small cans, known as ISCANS. These cans were all of the same diameter, 2.02 inches, and varied only in height as follows: 3.00 inches, 3.09 inches, 3.12 inches and 3.14 inches. Juices in these small cans were marketed generally as over the counter beverages. Bruce's Juices enter-

7. U. S. Law Week, Vol. 16, No. 36, issue of March 16, 1948, pages 3276 and 3277.

8. "For despite petitioner's plaint on the difficulty of proving damages, it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices. If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination."

9. Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 150 F.2d 988; American Can Co. v. Ladoga Canning Co., 7 Cir., 44 F.2d 763; City of Atlanta v. Chattanooga Foundry & Pipe Co., 6 Cir., 127 F. 763, 64 L.R.A. 721; Straus v. Victor Talking Machine Co., 2 Cir., 297 F. 791; Main Realty Cc. v. Blackstone Valley Gas & Electric Co., 59 R.I. 29, 193 A. 879, 112 A.L.R. 744; Sullivan v. Minneapolis & R. R. R. Co., 121 Minn. 488, 142 N.W. 3, 45 L.R.A.,N.S., 612; Seaman v. Minneapolis & R. R. R. Co., 127 Minn. 180, 149 N.W. 134; National Radiator Co. v. Pennsylvania R. Co., 6 N.J.Misc. 778, 143 A. 85.

ed this field in order to develop new outlets for the sale of juice and likewise to increase the sale of plaintiff's juice through the grocery stores, and the ISCAN was sold under the same name and trade mark. After an experimental period in the north where it sold ISCANS for 10¢, plaintiff entered certain southern states, known as the Southern area, in the fall of 1938, selling ISCANS for 5¢ and put on an extensive promotional campaign. The product was well received and during the first year in the southern area this business was profitably established and a large volume of juice thus sold. The next year plaintiff entered certain additional southern and western states, known as the West and North areas. In each of these areas it put on like promotional campaigns, but not with the same or in fact any appreciable success. Plaintiff contends that competition with juice sold in ISCANS by two of its competitors, Engelman Gardens of Texas and Morgan Packing Company of Indiana, was responsible for its failure to develop the West and North areas and for injury to its established business in the South area and that this competition was a direct result of discriminations on the part of American Can Company. The proof establishes that after years of pricing of ISCANS upon the basis of height, the diameters being the same, the defendant suddenly in September, 1939, reduced the price on one of these cans, known as the 2.02 x 3.12, disproportionately to all other ISCANS and even cheaper than the next smaller can, the 2.02 x 3.09. Plaintiff contends that this was a secret low price given Engelman Gardens. Whether it was or not, is not necessary for me to decide. However, defendant's exhibits show no sale of the 3.12 can at this low price to any purchaser after the sale to Engelman Gardens in September, 1939, until in June, 1940. This low price unquestionably favored Engelman Gardens and thereafter defendant granted a loan to Engelman Gardens of $400,000.

Morgan Packing Company, not previously in the ISCAN field, began purchasing 3.12 cans at this low price and canning juice in these cans at Austin, Indiana, in June, 1940. Plaintiff did not discover the low price on this can until the spring of 1940. Thereupon it urged defendant to equalize the prices of the various ISCANS, which defendant refused to do. Then plaintiff sought to purchase the 3.12 can for its own use.

For years defendant had maintained a pricing policy of equalizing freight for a purchaser to the factory or plant nearest point of delivery irrespective of where the cans were manufactured. Plaintiff had theretofore repeatedly purchased the 3.12 can and all the other ISCANS on this pricing policy. However, when plaintiff sought to purchase the 3.12 can at the new low price, defendant, contrary to its established policy, refused to equalize freight with Tampa and required plaintiff to pay freight on the 3.12 can from Baltimore to Tampa, while at the same time following its prior policy on all other size ISCANS and also selling the Morgan Packing Company the same can with freight equalized to Austin. This made it economically impossible for plaintiff to purchase the 3.12 can.

Both of these competitors of the plaintiff sold at a lower price than plaintiff, yet failed to sell their pack and were required to carry large portions thereof over to other seasons. The carry-over pack was known as "dead stock" and was sold as distressed merchandise. There followed a chaotic condition of the market in the ISCAN field.

That the stated competition, as well as the distressed condition of the market, greatly impaired plaintiff's sale of its ISCAN and thereby occasioned it damage, is made clear by the record. Likewise I am of the opinion that the retardation of the sale of ISCAN adversely affected sale of its grocery size juices and thus occasioned it additional damage.

I come now to the most difficult problem posed by this litigation, that of determining the amount of damage which has been suffered by the plaintiff. In resolving this question, I have initially given consideration to the purpose of the

Congress in its enactment of the Robinson-Patman Act, to wit, that of assuring equality of treatment and opportunity to small business. Next, I have carefully reviewed the principles of the law which will chart my course in endeavoring to arrive at a just and reasonable judgment. I approach this task with full realization of the difficulty—if not actual impossibility—which any one, who seeks redress under the anti-trust laws, is confronted in endeavoring to establish the quantum of his damage with the exactitude required in many fields of the law.

I am in full accord with the philosophy and sound reasoning of the "wrongdoer rule", last enunciated and amplified in the case of Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 580, 90 L.Ed. 652. Inasmuch as I am convinced that the American Can Company here falls in the category of a "wrongdoer", I feel no hesitancy in applying the principle enunciated in the above case in the following language: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." And where—as is true in connection with certain of the discriminations depicted in the record—the decline in business is "not shown to be attributable to other causes",[10] I am of the opinion that a dollar mark should be placed on the plaintiff's loss even though the dollar amount of the loss is not depicted in the record with absolute exactness.

From the discriminations hereinbefore mentioned, it is my considered opinion that the record establishes with that degree of certainty here reasonably possible that the plaintiff sustained actual injury and damage in the following particulars:

The unlawful allowance of the quantity discounts to plaintiff's competitors, which were practically not available to and were not received by the plaintiff, occasioned it very substantial damage.

The same is true with reference to the illegal runway allowance granted to plaintiff's competitor, Morgan Packing Company.

Each of these items of damage has heretofore been discussed and in view of the length of this opinion, I will not further amplify.

I have given careful consideration to plaintiff's claim of damage resulting from its loss of sales and profits incident to its ISCAN business and likewise from the retardation of its growth and expension in that field. I am of the belief that the defendant's discriminations in connection with the 3.12 can injured Bruce's Juices, and in fact occasioned it to lose substantial sales that it otherwise would have made. It also appears from the proof that Bruce's Juices' growth in the ISCAN field was definitely retarded by the competition which it confronted as a result of the low price given by defendant to Engelman Gardens, its refusal to equalize the price of other ISCANS, particularly the 3.14, and its subsequent denial to plaintiff of the absorption of freight from Baltimore to Tampa, in accordance with its theretofore uniform policy. Notwithstanding my above stated conclusions, I am not satisfied that the proof as to the amount of profit which the plaintiff made on ISCAN is sufficient to enable me to translate the particular damage resulting from this injury into dollars, and I am, therefore, not including in my judgment any sum for this claim. However, the injury thus sustained did, in my opinion, directly contribute to occasioning the damage hereinafter discussed.

Plaintiff further contends that the combined and aggregate effect of defendant's three discriminations, i. e., quantity discount allowances, runway allowances to Morgan Packing Company and the discrimination with reference to the 3.12 can, adversely and seriously injured its overall business structure and operation and that the damage so resultant is reflected and should be reasonably admeasured in dollars by (a) its failure to maintain progress in line with the growth of the citrus industry in Florida in grocery size

10. Bigelow case, supra, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. at page 660.

cans and (b) by the decided drop in its own sales of grocery size cans during the years immediately following the stated discriminations.

I am in accord with this contention and am of the opinion that the plaintiff's proof measures up to and brings this issue within the theory approved in the Bigelow case.

 Not only does the evidence not warrant the inference that the plaintiff's falling behind the growth of the industry, as well as its own prior pace, was "attributable to other causes", but the converse is true. While there is some degree of uncertainty as to the amount of injury and damage thus occasioned the plaintiff, I am of the opinion that such uncertainty as may exist by reason of "the absence of more precise proof" is a risk which properly here falls upon the defendant. I am satisfied that defendant's various discriminatory acts culminated in and occasioned substantial damage to the plaintiff and that said damage is reflected and shown with "a reasonable degree of accuracy, which is all that the law requires."[11]

The plaintiff also asserts that as a direct result of defendant's illegal conduct aforesaid, it was prevented from packing 386,330 cases bases twos (which is a yardstick in the trade for measuring quantity). The proof on this point discloses that in February, 1942, the government put into effect a regulation known as Order M-81 as a result of which a quota system was thereafter enforced and which limited a canner's pack to 125% of his 1940-41 pack. Thus the amount of tinplate or of cans available to the plaintiff for use in grocery size juice was dependent upon the amount of tinplate contained in all size cans used by it during the year prior to the regulation. Plaintiff contends that its loss of

sales in its small size juices, attributable to defendant's discriminatory practices, in turn occasioned its tinplate quota to be reduced and thus damaged it to the extent of the limitation in availability of cans during the year 1942. I find that the proof sustains plaintiff's contention of damage in the above regard.[12]

The plaintiff additionally urges that it is entitled to recover a reasonable sum as compensation for the damage which has been occasioned its "good will". The uncontroverted evidence establishes that the plaintiff had won public favor for its name, trade-mark and products to such an extent as to reasonably assure it of the retention of its customers. That the impact of the defendant's discriminations adversely affected this intangible, though valuable, asset can not be doubted.

It will be observed that I have not itemized the damages hereinbefore discussed. My failure so to do has been intentional and I will now state my reasons therefor. My study of the various items of damage sustained by the plaintiff has led me to the definite opinion that there is an overlapping therein which must be taken in consideration and omitted from my judgment. I am of the opinion that it will best serve the end of justice for me to determine the minimum amount of plaintiff's total damage, from which all inter-relation, duplication or overlap has been eliminated rather than to endeavor to segregate the various items.

 I, therefore, find as a fact that the plaintiff has sustained actual damages in the sum of $60,000, as a direct result of the defendant's violations of the provisions of the Act. It is my considered judgment that said sum is the minimum amount of

11. William Goldman Theatres, Inc. v. Loews, Inc., D.C., 69 F.Supp. 103, 108. See also Bigelow case, supra; Rankin Co. v. Ass'n Bill Posters, etc., 2 Cir., 42 F.2d 152; Palmer et al. v. Conn. Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Wawak & Co. v. Kaiser, 7 Cir., 129 F.2d 66; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; American Can Co. v. Ladoga Canning Co., 7 Cir., 44 F.2d 763; Roseland v. Phister Mfg. Co., 7 Cir., 125 F.2d 417, 139 A.L.R. 1013; Frey & Son, Inc. v. Welch Grapejuice Co., 4 Cir., 240 F. 114, 117.

12. See cases in Footnote 11 supra.

plaintiff's damage which was occasioned by the defendant's unlawful discriminations.

If anything in the foregoing opinion is in conflict with any finding of fact or conclusion of law heretofore made, the statement in the opinion may be taken as modifying the findings or conclusion.