**J. T. JONES, Appellant,**

v.

**METZGER DAIRIES, INC., Appellee.**

**No. 20816.**

United States Court of Appeals
Fifth Circuit.

July 23, 1964.

---

Dee C. Blythe, Clovis, N. M., H. E. Griffith, Lubbock, Tex., for appellant, Blythe & Norvell, Clovis, N. M., of counsel.

Charles P. Storey, Paul S. Adams, Jr., Storey, Armstrong & Steger, Dallas, Tex., for appellee, Metzger Dairies, Inc.

Before TUTTLE, Chief Judge, and HUTCHESON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

In this Robinson-Patman Act case (Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C. § 13), we are called upon to review certain rulings of the district court, which, inter alia, granted motion of defendant Metzger Dairies (appellee) for summary judgment, restricted the scope of written interrogatories propounded by the plaintiff Jones (appellant) to Metzger, and failed to rule upon plaintiff's motion for leave to file an amended complaint after the order granting summary judgment.

The plaintiff Jones filed this action for treble damages and an injunction against four corporate defendants (three of which have been subsequently removed by settlement) alleging price discrimination by Metzger against Jones in the sale of certain dairy products during the period April, 1959, until June 22, 1960. Jones was formerly an independent milk distributor in Winkler County, Texas, and prior to April, 1959, he had been a sub-distributor for Metzger in the sense that he purchased dairy products from Pecos Dairy Distributing Company who had purchased the same products from Metzger. He was also a distributor for Borden Dairy Products. Diagrammatically, the relative position of Jones in the distributive chain prior to April 1959, was that of a sub-distributor, whose immediate vendor was Pecos Dairy Distributing Company.[1]

The main thrust of plaintiff's attack is directed at the district court's ruling which, in effect, geographically limited the scope of the discovery process to ten counties in West Texas and a portion of

The only purpose of this diagram is to show the relationship which formerly existed between Metzger and Jones. The following is from appellant's brief:

"The period involved was June 22, 1956, to June 22, 1960, but Metzger was involved only from April, 1959, to June 22, 1960. Before April, 1959, Jones was a distributor for Borden dairy products and a sub-distributor for Metzger dairy products, but in that month he gave up his Metzger sub-distributorship, which was taken over by his former employee, Earl D. Adams (R. 198,208,211)."

eastern New Mexico. Plaintiff assiduously contends that such a restriction is improper and that the "relevant market" in this cause can be properly expanded to include "the United States or any territory thereof or the District of Columbia, or any insular possession or other place under the jurisdiction of the United States."

■ We readily concede that the concept of the "relevant market" as applied to antitrust cases is certainly less than static. We are prepared to venture even further and conclude that the term "relevant market" is a rather evanescent term which can be skillfully manipulated somewhat in the manner of an accordion. In the instant proceedings, however, it is our opinion that the proper determination of the relevant market should not embrace any area beyond the restrictions provided by the order of the learned trial judge. See United States v. Watchmakers of Switzerland Inf. Ctr., (U.S. D.C. S.D. N.Y. 1958) 168 F.Supp. 904, wherein the trial judge held that discovery procedures must be limited if antitrust cases are to be kept within "reasonable bounds." See also T. C. Theater Corp. v. Warner Bros. Pictures, Inc., et

2. "* * * There was competition between the favored and unfavored retailers in Louisiana. Stated differently, we have a manufacturer engaged in interstate commerce making an allowance to two food chain customers who are also engaged in interstate commerce in connection with products sold only in intrastate competition, but with the allowance being made or used in interstate commerce. This, we think, meets the test of the statute that the allowance payments be made in the course of the commerce that Petitioner was engaged in at the time.
"This is clear from the language of § 2(d). It is unlawful for any person engaged in commerce [Petitioner] to pay to a customer [Weingarten and Childs] in the course of such commerce as compensation for any services furnished by the customer [Weingarten and Childs] in connection with the resale by the customer of the goods of such person [Petitioner], unless such payment is available on proportionally equal terms to all other customers competing in the distribution of such products.

al., 16 F.R.D. 173, 175 (D.C.S.D. N.Y., 1954); and United Cigar-Whalen Stores Corp. v. Phillip Morris, Inc., 21 F.R.D. 107 (D.C.S.D. N.Y., 1957).

■ The general criteria of the Robinson-Patman Price Discrimination Act are these: (1) the transaction must be in interstate commerce; (2) it must have the effect of substantially lessening competition or tending to create a monopoly; (3) or it must have the effect of injuring, destroying or preventing competition with any person who either grants or knowingly receives the benefit of such discrimination, or with the customers of *either of them*. The acts complained of did not occur in interstate commerce, nor did they involve the factual circumstances outlined in our recent case of Shreveport Macaroni Manufacturing Company v. F. T. C., 321 F.2d 404 (5 Cir. 1963).[2] Here the alleged discrimination was based on sales made by Metzger to Pecos, an independent milk distributor, which in turn resold some of these products to Jones. Metzger's plant was located in Dallas County, Texas. Pecos and Jones were located in Winkler County, Texas. The overall activities of Metzger show that it was engaged in interstate commerce.[3]

* * * * *

"* * * The section is applicable so long as the transaction, and we suppose this means sale, with either the favored or the competing disfavored customer crosses a state boundary. See also Austin, Price Discrimination under the Robinson-Patman Act (1953), pp. 117, 118."

3. The appellee Metzger relies heavily on Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943 (6 Cir. 1962), cert. den. 373 U.S. 934, 83 S.Ct. 1534, 10 L.Ed.2d 691. On the other hand, Jones contends that it "is bad law and will be reversed sooner or later by the Supreme Court." While the questions in Willard Dairy are somewhat similar to those presented in the instant case, we have not found it necessary to rely on that decision, from which we quote:
"The Act applies to discrimination between different purchasers of commodities of like grade and quality, and holds the seller, in such a case, liable. Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 7, C.A. 7th; Gen-

■ It is true that the Robinson-Patman Act has been held to prohibit purely local discriminatory activities perpetrated by an interstate manufacturer when the result of these activities may be to substantially lessen competition or "to destroy local business." Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954). The instant case does not present a Mead situation. In Mead, interstate commerce was used to foster the creation of a monopoly and thereby destroy a local business. As there stated, " * * * the treasury used to finance the warfare is drawn from interstate, as well as local, sources which include not only the respondent but also a group of interlocked companies engaged in the same line of business * * *."

Nor do we feel that Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10 Cir. 1959) cert. den. 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727, supports the plaintiff's contentions under the facts developed. In Atlas, considerable emphasis was laid on the size of the accused company and its economic power. The accused company was the largest manufacturer and supplier of the product involved; it enjoyed a virtual monopoly and possessed dominant market power in the area; and it was concluded that it utilized its dominant market power to foster predatory practices consisting of price discrimination, substantial reduction of competition, and the creation of a monopoly. Such activities and practices extended across state lines.[4] In

eral Shale Products Corp. v. Struck Const. Co., 132 F.2d 425, 427, C.A. 6th. The Act has been construed as giving a right of action to a competitor of the seller who is injured in his business thereby as well as to a customer who has been discriminated against. Ludwig v. American Greetings Corporation, 264 F.2d 286, 289, C.A. 6th. However, by the express terms of the statute it is essential to establish a violation that the sale complained of be by a person 'engaged in commerce, in the course of such commerce.' Standard Oil Co. v. Federal Trade Comm., 340 U.S. 231, 236-237, 71 S.Ct. 240, 95 L.Ed. 239. "In the present case there is no question but that the defendant was engaged in commerce, but it is contended that the discriminating sales complained of were not made 'in the course of such commerce' and therefore were not in violation of the Act. The authorities appear to hold that it is not enough under the Clayton Act, as amended by the Robinson-Patman Act, that the defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate commerce. (Citing cases) In Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, relied upon by appellant, purchases involved in the alleged discrimination were in interstate commerce and interstate sales of like grade and quality were discriminated against. Central Ice Cream Co. v. Golden Rod Ice Cream Co., supra, 287 F.2d 265, 267, C.A. 7th. "The cases recognize a distinction between the commerce which is covered

by the Sherman Act and that covered by the Robinson-Patman Act. 'In an action brought under the Robinson-Patman Act it is necessary to allege and prove that the transactions complained of are actually in interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have affected interstate commerce.' "

4. The following is from the testimony of plaintiff Jones:

"Q. Did you or did you not tell Earl Adams that if he talked to anyone from Metzger to tell them not to worry or anything substantially like that?

"A. The only thing I told Earl Adams that I didn't know whether I had too much of a case against Metzger's Dairies.

"Q. Is that all you told him?

"A. I told him that—I also told him that I don't think Metzger ought to be too much worried about it."

* * * *

"Q. Well, do you attribute any of your damages arising out of your loss of the Metzger distributorship to the Metzger Dairies?

"A. No, I can't contend that Metzger Dairies were at fault as to me losing my Metzger distributorship.

"Q. Or do you attribute any to Pecos Dairy Distributors, I believe their name is, in that connection?

"A. Since he isn't a defendant in the suit, I cannot attribute any loss to him." (According to the statements of the parties and the facts disclosed by the record, Jones was actually a sub-distributor and

**924**

carefully reviewing the facts of the instant case, we are unable to determine with any degree of certainty that discrimination[5] has ever taken place. In order for there to be discrimination between purchasers, there must be actual sales at two different prices to two different actual buyers. A. J. Goodman & Son v. United Lacquer Mfg. Corp., (D.C.Mass.) 81 F.Supp. 890, 892. See: Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219; Shaw's, Inc. v. Wilson-Jones Co., (CCA 3) 105 F.2d 331; Sorrentino v. Glen-Gery Shale Brick Corp., (D.C.Pa.) 46 F.Supp. 709.

■ From the facts presented in the instant case we are unable to conclude that any acts of price discrimination occurred between the plaintiff Jones and Metzger Dairies, Inc. No sales of Metzger's products were made to Jones during the period in question. Metzger sold only to its distributor, Pecos. The courts

have uniformly held that the Act contemplates two purchasers. Hartley & Parker, Inc. v. Florida Beverage Corp., (5 Cir. 1962) 307 F.2d 916; Naifeh v. Ronson Art Metal Works, Inc., (10 Cir. 1954) 218 F.2d 202, affirming 117 F.Supp. 690 (D.C.W.D.Okla., 1953); Klein v. Lionel Corp., (U.S.D.C.Del., 1956) 138 F.Supp. 560, 563; Shaw's, Inc. v. Wilson-Jones Co., (3 Cir. 1939) 105 F.2d 331.[6] A. J. Goodman & Son, Inc. v. United Lacquer Mfg. Corp., (U.S.D.C.Mass. 1949) 81 F.Supp. 890, 892. As recently stated by this Court, "The evil at which the Robinson-Patman Act is aimed is discrimination between different competing purchasers where the effect of such discrimination may be substantially to lessen competition or tend toward a monopoly in commerce." Hartley & Parker, Inc. v. Florida Beverage Corp., supra.[7] It is not necessary that the purchasers involved must be on the same distributive level. A violation of the Act may occur when a manufacturer sells his

obtained his products from Pecos who in turn obtained the same products from Metzger.)

5. The term "discrimination" as defined in Webster's New Collegiate Dictionary, 1961, means: "to make a difference in treatment or favor (of one as compared with others)." Black's Law Dictionary interprets "discrimination" as " * * * a failure to treat all equally." Volume 12A, Words and Phrases, at page 362 defines "discrimination" within the Clayton Act, as amended, as "the act of unfairly, injuriously and prejudicially *distinguishing between persons * * *.*" (emphasis supplied)

6. The following is from the Shaw's, Inc. opinion:
"* * * * The discrimination in price referred to must be practiced 'between different purchasers'. Therefore at least two purchases must have taken place. The term purchaser means simply one who purchases, a buyer, a vendee. It does not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing. In other words, it does not mean a prospective purchaser, or one who wishes to purchase, as the appellant contends.
"The appellant in its brief lays emphasis upon the fact that the appellee had sold

supplies to it in the past and had promised to quote prices so that the appellant might bid upon Registration Commission contract. In short, the appellant contends that it was a customer of the appellee's and therefore a purchaser. Section 2 of the Act was designed, however, to prevent interference with the current of commerce. For the provisions of the Section to be operative, goods or commodities must be in the flow of commerce, or services must have been rendered or have been contracted to be rendered in connection with goods or commodities so placed. We may surmise that if the goods or commodities are not wholly within that flow, they at least must be touched by it, affected by it, so to speak. This we think to be the limitation imposed by Congress. Past purchases or conversations in respect to possible future purchases are insufficient."

7. In answer to interrogatories, Metzger's Secretary-Treasurer made the following factual statement which is uncontradicted in the record:
"During the period from April, 1959, to June 2, 1960, Metzger sold no dairy products to any other independent distributor such as Pecos Dairy Distributing Company in other parts of Texas, nor in any other state."

products to a retailer at a lesser price than that charged to a wholesaler whose customers compete with the retailer. F. T. C. v. Morton Salt Co., 334 U.S. 37, 55, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). We conclude that Jones has failed to establish the existence of any price discrimination, and that the district court was correct in granting the motion for summary judgment.[8]

■■ We find no error in the action of the trial court in refusing to allow the appellant to make further inquiry into the gross sales of Metzger in the State of Texas, or elsewhere in the United States.

In our judgment, the facts with regard to the activities of Metzger were fully developed and known to the court and the parties. Even though not in the exact form requested by the plaintiff Jones, information as to gross sales by Metzger was fairly well presented. Full and complete discovery should be practiced and allowed, but its processes must be kept within workable bounds on a proper and logical basis for the determination of the relevancy of that which is sought to be discovered.

■■ The allowance of amendments is a matter within the sound discretion

---

**8.** We have had difficulty, as apparently did the trial court and defendant Metzger, in locating unlawful discrimination against the plaintiff Jones, or the presence of other predatory or prohibited practices. See "Report of the Attorney General's National Committee to Study the Antitrust Laws" (1955):

"Consonant with these policies, this Committee recommends that analysis of the statutory 'injury' center on the vigor of competition in the market rather than hardship to individual businessmen. For the essence of competition is a contest for trade among business rivals in which some must gain while others lose, to the ultimate benefit of the consuming public. Incidental hardships on individual businessmen in the normal course of commercial events can be checked by a price discrimination statute only at the serious risk of stifling the competitive process itself. Nor should a competitive price reduction be singled out as responsible for 'injury' if alternative means of access to goods at the lower price are in any event available to the buyer.

"Such a view comports with the text of Section 2(a). We emphasize that it is not 'injury' to competitors but adverse effects on 'competition with' parties privy to discriminations that the statute expressly forbids. Hence we believe that criteria of competitive effect which focus exclusively on individual competitors' sales or profits rather than the health of the competitive process literally go beyond the terms of the law. "In some circumstances, to be sure, injury to even a single competitor should bring the Act into play. Predatory price cutting designed to eliminate a smaller business rival, for example, is a practice which inevitably frustrates

competition by excluding competitors from the market or deliberately impairing their competitive strength. The invalidation of such deliberate price slashes for the purpose of destroying even a single competitor, moreover, accords distinct recognition to the narrower tests of 'injury' added to the price discrimination provisions of the Clayton Act through the 1936 Robinson-Patman amendments. The discrimination provisions in the original Clayton Act were feared by the legislators as inadequate to check the victimization of individual businessmen by predatory price cuts that nevertheless created no general impairment of competitive conditions in a wider market. To reach such destructive price cuts endangering the survival of smaller rivals of a powerful seller was an express objective of the liberalizing amendments in the 'injury' clause of the Robinson-Patman Act." The failure of the record to show by clear allegations in the pleadings, by the evidence, or otherwise, that the defendant Metzger was guilty of unlawful price discrimination, or other predatory and prohibited practices, was the subject of inquiry from the court on oral argument. The following statement from the supplemental brief of Metzger remains unanswered by Jones:

"On this point and on the case as a whole, in oral argument Appellant's counsel was again requested and challenged to state the two sales or the two customers to whom Metzger sold its products in this suit—that is, to name just two customers or any two sales, one of which is alleged to be discriminatory. Appellant will not and cannot respond to this request—much less show which sale crossed a state boundary."

of the trial court, and denial of a motion to amend will not be disturbed on appeal unless there has been a clear abuse of discretion. We are not unmindful of the fact that F.R.Civ.P. 15 enjoins liberality in granting amendments and that "leave 'shall be freely given when justice so requires.'" Lone Star Motor Import, Inc. v. Citroen Cars Corp., (5 Cir. 1961) 288 F.2d 69; Watson v. Employers Liability Assur. Corp., (5 Cir. 1953) 202 F.2d 407, rev. other grounds 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74, rehear. den. 348 U.S. 921, 75 S.Ct. 289, 99 L.Ed. 722; Hall v. National Supply Co., (5 Cir. 1959) 270 F.2d 379; Volvia v. Bennett, (5 Cir. 1953) 201 F.2d 434. In our view, the allowance of the amendment would not have saved the plaintiff's case. It is apparent to us that all the issues available to the parties were fairly and carefully presented and understood by the trial court. We can detect no abuse of discretion.[9]

On oral argument, counsel for the plaintiff Jones forthrightly stated that he had been unable to find a case in point to support his contentions in the instant case. We have carefully reviewed a rather well-developed evidentiary record, the initial briefs, supplemental briefs, and reply briefs. The case remains nebulous, vague, indefinite and uncertain. Our examination of the record and briefs, however, convinces us that the case was fairly and patiently considered by the trial court and that the correct result was reached. The learned and experienced trial court retained jurisdiction of the case for approximately three years, during which period of time there were conferences, pretrial procedures, depositions, interrogatories, motions, answers, briefs, and other proceedings. The docket entries alone require almost 19 pages of the record. We have found no error.

The judgment is affirmed.

9. Actually the court never ruled on the motion seeking an amendment; but as stated by the plaintiff Jones, the motion was not granted, and therefore the plaintiff considered it to have been denied.