**FEDERAL INSURANCE COMPANY,**
Plaintiff–Appellant,

v.

**STROH BREWING COMPANY,**
Defendant–Cross Defendant–
Appellant,

and ·

**Employers Mutual Insurance Company
of Wausau, Defendant–Cross
Claimant–Appellee.**

No. 96–1477.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1997.

Decided Sept. 19, 1997.

had under the circumstances, based upon an

argument that the defendants never made.

**564**

David C. Campbell, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, Timothy M. Thornton, Jr. (argued), Santa Monica, CA, for Plaintiff–Appellee.

Dwight B. Palmer, Jr. (argued), Sara E. Elder, Wilson & McIlvaine, Chicago, IL, Gary J. Rickner, Barrett & McNagny, Fort Wayne, IN, for Defendant–Appellant.

Before CUDAHY, FLAUM and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Say "discrimination" today and those around you may think of race or sex discrimination, usually in connection with a school or work setting. But that has not always been the case. Time was, "discrimination" might have brought immediately to mind charging one person more than another for the same product. That definition, although perhaps less in public consciousness, remains just as valid today.[1]

■ G. Heileman Brewery Company, Inc. (Heileman) purchased an umbrella business liability insurance policy from Federal Insurance Company (Federal).[2] In June of 1994 Calumet (a wholesale beer distributor in Indiana) sued Heileman for discrimination allegedly based on Heileman's pricing practices. In March of 1995, Heileman turned this lawsuit over to its insurer, Federal, and requested both that Federal defend it against Calumet and that Federal cover any losses Heileman might incur as a result of the suit. Not until August of 1995 (with trial set for November 6 of the same year) did Federal alert Heileman that it was declining both coverage and the duty to defend. Heileman

1. The fact that personal discrimination has joined price discrimination in public consciousness certainly does not justify the dissent's suggestion that price discrimination has now somehow become obscure, if not entirely lost to public view.

2. Heileman has recently gone bankrupt and been purchased by The Stroh Brewery Company. Stroh substituted for Heileman in the appeal, but we will refer to Heileman and Federal for clarity's sake. Employers Mutual Insurance Company of Wausau has been voluntarily dismissed from the appeal by Stroh.

spent $650,000 defending itself and then settled for an additional $850,000. Heileman then sued Federal, seeking coverage, and Federal countersued, seeking a declaratory judgment of no coverage. The district court entered summary judgment in favor of Federal, denying coverage. We review a summary judgment de novo, and will affirm only if no genuine issue of material fact remains to be resolved and if Federal is entitled to judgment as a matter of law. *See Alexander v. City of Chicago*, 994 F.2d 333, 335 (7th Cir.1993). We reverse.

We must determine the extent of Federal's duty to defend and duty to indemnify. Whether Federal had a duty to defend Heileman depends on whether Calumet's complaint alleged facts giving rise to liability. Calumet's suit accused Heileman of engaging in price discrimination. Heileman offered a staggered price discount based on the volume purchased.[3] Calumet sued; it believed that Heileman's pricing structure discriminated against smaller wholesalers unable to purchase large amounts of beer on a monthly basis. Only one wholesaler, Central Distributing, was able consistently to purchase enough beer to qualify for the largest discount. Calumet thus believed Heileman favored Central Distributing over other wholesalers. Calumet sought relief under the Clayton Act, the Robinson–Patman Act and Indiana beverage laws.[4]

Heileman's policy covers, among other personal injuries, "discrimination." Calumet repeatedly alleged discrimination in its complaint: "Heileman is now and has been discriminating in price between different purchasers of commodities of like grade and quality, that is, Heileman is selling and has sold beer, a commodity, of identical grade and quantity at the same time at different prices to different customers." Calumet Complaint at 17 (internal quotation marks omitted). "The sales by Heileman to Central Distributing, Heileman's favored purchaser, and Calumet, Heileman's disfavored purchaser, are a discrimination in commerce." *Id.* "The effect of such discrimination not only may be to substantially lessen competition but has, in fact, already substantially lessened competition in the sale of Heileman beer in Northwest Indiana." *Id.* "The effect of such discrimination by Heileman has also been to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." *Id.* "This discrimination is not because of any due allowance for difference in the cost of manufacture, sale, or delivery." *Id.* at 18 (internal quotation marks omitted). "This discrimination is not in response to changing conditions." *Id.* Thus, if discrimination in price is covered by the policy, Federal had a duty to defend Heileman.

Heileman argues that Calumet's complaint falls within the plain language of the policy and that Federal's duty to defend is correspondingly clear. Federal believes "price discrimination" to be a term of art describing conduct not included in coverage for "dis-

---

3. When the pricing plan was first announced, Heileman offered the following discount schedule:

| Number of Cases Purchased | Amount of Discount |
| --- | --- |
| 30,001 to 50,000 | 10 |
| 50,001 to 75,000 | 20 |
| 75,001 + | 30 |

By 1991, a 50 per case discount required the purchase of at least 105,001 cases while the lowest discount, 10 per case, required purchase of at least 4,500 cases. By April of 1994 the breakdown was even more demanding:

| Number of Cases Purchased | Amount of Discount |
| --- | --- |
| 4,500 to 19,999 | 10 |
| 20,000 to 34,999 | 20 |
| 35,000 to 54,999 | 30 |
| 55,000 to 149,999 | 40 |

| | |
| --- | --- |
| 150,000 + | 50 |

The top number was increased again the very next month, to 160,001 cases. Calumet was Heileman's second largest wholesaler in Indiana, with monthly purchases averaging approximately 32,000 cases. Central Distributing purchased approximately 150,000 cases a month.

4. Indiana Code § 7.1–5–5–7, *Sales—Discrimination by Permittee* reads as follows:

It is unlawful for a permittee in a sale or contract to sell alcoholic beverages to discriminate between purchasers by granting a price, discount, allowance, or service charge which is not available to all purchasers at the same time. However, this section does not authorize or require a permittee to sell to a person to whom he is not authorized to sell under the title.

crimination." The district court agreed with Federal and gave two alternative reasons for denying coverage. First, that the term "discrimination" was unambiguous and had only one meaning which did not include "price discrimination." Second, that, even if "price discrimination" were properly understood as part of "discrimination," the policy contained an exclusion which applied to the facts as alleged by Calumet. Because we find that "price discrimination" is simply a particular form of discrimination, and because we find that, even if the exclusion does apply, Federal is estopped from asserting it, we reverse.

## I. Duty to Defend

■ We note as an initial matter that Indiana law (which here follows generally accepted principles) governs the present case. Typically, an insurer has a duty to defend its insured against suits alleging facts that might fall within the coverage. While the insurer does not have an unconditional duty to defend, the insurer's duty is expansive, since the duty to defend is considerably broader than the duty to indemnify. *See Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind.1996). The parties dispute how an insurer must determine whether the duty to defend has been triggered. Federal relies on *Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205 (Ind.Ct.App.1995), an Indiana Court of Appeals decision which holds that "[i]f the pleadings disclose that a claim is clearly excluded under the policy, no defense is required.... When the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend." *Id.* at 1208. Heileman prefers an Indiana Supreme Court statement that "[t]he duty to defend is determined solely by the nature of the complaint." *Transamerica Ins. Servs. v. Kopko,*

570 N.E.2d 1283, 1285 (Ind.1991); *see also Wayne Township,* 650 N.E.2d at 1208 (quoting *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1339 (Ind.Ct.App.1993)) ("It is the nature of the claim and not its merits that determines the duty to defend.").

■ This is not the first time we have tangled with the variously framed pronouncements of the Indiana courts on this issue. *See Fidelity & Guar. Ins. Underwriters, Inc. v. Everett I. Brown Co.*, 25 F.3d 484, 489–90 (7th Cir.1994). While Indiana's courts may use differing language to describe the standard, we believe there is essentially only one standard—that the allegations of the complaint, including the facts alleged, give rise to a duty to defend whenever, if proved true, coverage would attach. Calumet's complaint alleged discrimination (in favor of Central Distributing and against Calumet) that took the form of a pricing structure giving Central Distributing a lower price than Calumet for the same product.

■ Hence, we examine the policy issued by Federal and the complaint filed by Calumet to determine if Federal had a duty to defend Heileman in the Calumet litigation. Heileman's umbrella policy contained two forms of coverage, of which only Coverage B is at issue here. Coverage B promised that Federal would pay on Heileman's behalf any damages resulting from "personal injury" or "advertising injury" if caused by an offense committed during the policy period and no primary insurance applied. We are concerned only with the "personal injury" coverage in the present case. Personal injury is defined by the policy, in part, as "humiliation or discrimination EXCEPT: (1) when arising out of the willful violation of a statute; (2) when committed by or with knowledge or consent of the insured." [5] The term "dis-

---

5. The dissent relies prominently on arguments based on the listing of "discrimination" under the category of "personal injury" and its grouping with the term "humiliation." Federal made these arguments in the district court, which rejected them, but has not renewed them on appeal. They do not appear in Federal's brief, and the effort of the dissent to find them somehow in the general structure of Federal's argument is

very unconvincing. *See* Dis. Op. at 572 n. 1. About these arguments the district court noted:

Federal first takes the position that because the term discrimination falls under the heading "PERSONAL INJURY" and further because it is grouped with the term "humiliation" which is in the nature of an offense to the person, discrimination means "personal discrimination" as opposed to "economic discrimination

crimination" within this definition is not defined in the policy. Nevertheless, to determine if Calumet's allegations are properly considered discrimination under the policy we must look to the meaning of "discrimination" as used in the policy.

Federal defends its denial of coverage with the argument that "price discrimination" is a term of art, not covered by the policy under the designation "discrimination." Heileman argues both that Calumet's complaint alleges discrimination, pure and simple, and that "price discrimination" is merely a label for the particular form of discrimination alleged by Calumet. Further, because the policy at issue is an "umbrella" policy, drafted by Federal, Heileman argues that the language should be interpreted broadly and against the insurer. *See Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 (1st Cir.1993) ("Umbrella policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage).... Moreover, this interpretation is consonant with the broader function served by umbrella policies—extending coverage even to unanticipated 'gaps.' As one authority has explained, umbrella policies effectively shift *away from the insured* the burden of choosing the risks to which the insured remains exposed.") (citations omitted) (emphasis supplied).

■■■■■ In Indiana, the clear and unambiguous language of an insurance policy must be given its plain and ordinary meaning. *See American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996); *City of Muncie v. United Nat'l Ins. Co.*, 564 N.E.2d 979, 982 (Ind.Ct.App.1991). However, when there is ambiguity, "insurance policies are to be construed strictly against the insurer." *Kiger*, 662 N.E.2d at 947. Further, an "intelligent

layperson['s]" view is the standard used to interpret insurance terms. *Id.* at 948 n. 2. A term is ambiguous if reasonable persons could "honestly differ as to the meaning of the policy language," *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985), or whenever the language has two or more reasonable meanings. *See Wood v. Allstate Ins. Co.*, 21 F.3d 741, 744 (7th Cir. 1994); *see also Ramirez v. American Family Mut. Ins. Co.*, 652 N.E.2d 511, 514 (Ind.Ct. App.1995). "Price discrimination" is not merely a sui generis term of art, but also describes a form of the more general term, "discrimination." Discrimination "simply means differential treatment." *Indiana Wholesale Wine & Liquor Co., Inc. v. State ex rel. Indiana Alcoholic Beverage Comm'n*, 662 N.E.2d 950, 960 (Ind.Ct.App.1996). Whether that differential treatment takes the form of not receiving a promotion to which one is entitled or of being required to pay a higher price for beer does not make it any the less "discrimination." *See, e.g., Oregon Waste Systems, Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) ("discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."); *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, seriatim, 447–48 (1907) (discussing price differentials in rail fares as discrimination and referring to law making it "a misdemeanor to offer, grant, give, solicit, accept, or receive any rebate from published rates or other concession or discrimination."); *Richmond, Fredericksburg & Potomac R.R. Co. v. Department of Taxation*, 762 F.2d 375, 380 n. 4 (4th Cir.1985) ("In essence, discrimination is a 'failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.' ");

in business operations in violation of antitrust laws."
Memo. Op. at 6. The district court rejected this argument, stating that by its own terms the policy does not limit personal injury coverage to injuries suffered by natural persons as opposed to business entities, that "personal injury" is defined to include several injuries regularly suffered by businesses and that the insurance policy was written for a business entity, not for an

individual, and that "while it might appear to make little sense as a linguistic matter to conclude that personal injury coverage could conceivably allow recovery for an economic harm to a business, from a practical standpoint such coverage, where appropriate, should be available."

Memo. Op. at 7. Federal has abandoned these arguments on appeal. It is therefore puzzling that the dissent continues to rely on them.

*Hocking Valley Ry. Co. v. United States,* 210 F. 735, 738 (6th Cir.1914) (describing "discrimination" as the giving of an advantage). As these cases show, courts frequently define discrimination as differential treatment.[6]

Heileman offers a number of dictionary definitions as well; we note one, from Black's Law Dictionary. That dictionary has been approvingly cited by the Indiana Supreme Court as the type of resource an "intelligent layperson" might consult. *Kiger,* 662 N.E.2d at 948 n. 2. A portion of Black's "discrimination" definition reads: "With reference to common carriers, a breach of the carrier's duty to treat all shippers alike, and afford them equal opportunities to market their product. A carrier's failure to treat all alike under substantially similar conditions.... See also ... Price discrimination."[7] BLACK'S LAW DICTIONARY 467 (6th ed.1990). Black's defines "price discrimination" thus:

> Exists when a buyer pays a price that is different from the price paid by another buyer for an identical product or service. Price discrimination is prohibited if the effect of this discrimination may be to lessen substantially or injure competition, except where it was implemented to dispose of perishable or obsolete goods, was the result of differences in costs incurred, or was given in good faith to meet an equally low price of a competitor.

*Id.* at 1189. The second sentence of Black's definition of "price discrimination" parallels the language of the Robinson–Patman Act. This may lend some weight to Federal's argument that "price discrimination" is a term of art under that Act. However, this tracking of the Act does not show that "price discrimination" is *not* a form of generic discrimination.

The Robinson–Patman Act has been interpreted by courts to prohibit discrimination, not just "price discrimination." *See Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 436, 103 S.Ct. 1282, 1289, 75 L.Ed.2d 174 (1983) ("the Act 'is of general applicability and prohibits discriminations generally' "); *Jones v. Metzger Dairies, Inc.,* 334 F.2d 919, 924 (5th Cir.1964) ("The evil at which the Robinson–Patman Act is aimed is discrimination between different competing purchasers where the effect of such discrimination may be substantially to lessen competition or tend toward a monopoly in commerce.") (quoting *Hartley & Parker, Inc. v. Florida Beverage Corp.,* 307 F.2d 916 (5th Cir.1962)). The Supreme Court has said that discrimination in price means "selling the same kind of goods cheaper to one purchaser than to another." *Federal Trade Comm'n v. Anheuser–Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960); *Federal Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 721, 68 S.Ct. 793, 813, 92 L.Ed. 1010 (1948). Further, the Robinson–Patman Act has long been recognized to forbid discrimination in a variety of forms. In *Centex–Winston Corp. v. Edward Hines Lumber Co.,* 447 F.2d 585, 587 (7th Cir.1971), we noted that the Act "is directed against discriminatory treatment of purchasers engaged in the resale of the seller's goods." (Citations omitted.) Federal concedes that discrimination can be defined as differential treatment. Federal Br. at 14. Federal insists, however, that "price discrimination" is a term of art, not a designation of a particular form of discrimination. We do not agree with Federal's position, but even if we did, we would find that the term "discrimination" as used in the Heileman policy is ambiguous. Thus, we must interpret the term in favor of coverage and against Federal. "Discrimination," as used in the policy, encompasses Calumet's allegations. Federal had a duty to defend.[8]

---

6. The attempt of the dissent to argue that the Robinson–Patman Act's use of the word "discrimination" rather than "differentiation" is fortuitous is misplaced. *See* Dis. Op. at 573. The Act refers to discrimination for precisely the same reasons Calumet did; *discrimination* is taking the *form* of price differentiation. We do not know of any statute that uses the term "price differentiation."

7. While the dissent believes our attention to the definitions of "discrimination" and "price discrimination" gives the words a distorted reading, *see* Dis. Op. at 572, we note that the definitions highlight the varied meanings of the term "discrimination." Discrimination encompasses more than the current, ten-o'clock-news version of its "common sense" meaning.

8. We also disagree with the dissent's reliance on dictum in *Curtis–Universal v. Sheboygan E.M.S.*

This duty may be supported further by examining the parties' expectations when the policy was written and purchased. *See Wood*, 21 F.3d at 743 ("Insurance policies are contractual agreements, and in divining their terms the starting point is of course the intent of the parties.") (citing *Evans v. National Life Accident Ins. Co.*, 467 N.E.2d 1216, 1219 (Ind.Ct.App.1984)). Because the term "discrimination" is not defined in the policy and because price discrimination suits such as Calumet's are common in the beer industry, it is not objectively unreasonable for Heileman to have believed that it was purchasing coverage for just such a suit as Calumet's. *See, e.g., Vanco Beverage*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (price discrimination suit); *Anheuser–Busch*, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (same); *Lake County Beverage Co., Inc. v. 21st Amendment, Inc.*, 441 N.E.2d 1008 (Ind. Ct.App.1982) (same). This may be the case even though in the present day "discrimination" might bring first to mind differences in personal treatment.

The district court is mistaken in its conclusion that to allow coverage in this case would have the effect of encouraging Heileman to engage in the illegal activity of price discrimination. Unlike the apparent belief of the district court that all price discounts are discriminatory in some way, quantity discounts are legal so long as they are cost justified. *Vanco Beverage*, 460 U.S. at 435, 103 S.Ct. at 1288–89. In fact, the district court's concern would be equally appropriate with respect to insurance covering *any* intentional acts. Whether the policy insures for personal discrimination (e.g., age or sex) *and* price discrimination or for only personal discrimination, the policy "encourages" discrimination in either case.

## II. Policy Exclusion

The district court held that, even if price discrimination is covered by the policy, the facts alleged by Calumet fit an exception, thus removing the coverage. The policy language reads:

> c. humiliation or discrimination EXCEPT:
>
> (1) when arising out of the willful violation of a statute;
>
> (2) when committed by or with knowledge or consent of the insured.

The district court held that the exceptions contained in clauses (1) and (2) are "mutually exclusive." Memo. Op. at 12. It reached this conclusion on the grounds that "the policy states two separate exceptions which are made textually clear by the division of the exceptions into two subparagraphs and are made syntactically clear by the use of a semicolon." *Id.* Because "the pricing of a product is a conscious, carefully considered business decision . . . not . . . done arbitrarily or by accident" the court determined that clause(2) applied and would exclude coverage. *Id.* Just as general policy language must be clear to be enforced, so must the language of any policy exceptions. Doubts and ambiguities should be construed against the drafter, *see Allstate Ins. Co. v. United Farm Bureau Mut. Ins. Co.*, 618 N.E.2d 31, 33 (Ind.Ct.App.1993), particularly where the policy language purports to exclude coverage. *See Kiger*, 662 N.E.2d at 947.

Heileman argues that the exclusion is not to be read in the disjunctive as the district court held, but in the conjunctive, as if the semicolon represented an "and." Heileman relies on a grammatical construction, supported by several policy arguments, to interpret the exclusion in its favor. Heileman, in its grammatical argument, notes first that the two branches of the exclusion are separated by a semicolon and second, that throughout the policy, when an alphabetic provision is followed by numbered subparts (as in this exclusion), the semicolon between the numeric (but not necessarily the alphabetic) subparts is either followed by the word "or" or is not followed by any word.[9] In the

---

*Inc.*, 43 F.3d 1119, 1123 (7th Cir.1994); Dis. Op. at 573. The problem there was to determine the reach of the omnibus and notoriously flexible term, "unfair competition." "Discrimination" has a much more specific meaning, which may or may not involve the antitrust laws. *Cf. Texas & Pac. Ry. Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) (decided under Interstate Commerce Act).

9. Federal responds by pointing to the occasions when the policy follows a semicolon with "and" "at the ends of paragraphs and within sen-

three cases where the semicolon is standing alone, substituting the word "and" makes sense in every case. Heileman concedes that in the present exclusion either "or" or "and" can be read and still make grammatical sense.

But, Heileman argues, an "or" does not make sense in terms of the policy's purpose and the parties' intent. Further, if the exclusion is in the conjunctive, it is a standard type of exclusion. *See, e.g., Ethicon, Inc. v. Aetna Cas. & Sur. Co.,* 737 F.Supp. 1320, 1326 (S.D.N.Y.1990) ("The policy goes on to state that it does not apply 'to injury arising out of the wilful violation of a penal statute or ordinance [and] committed by or with the knowledge or consent of any insured.'"). On the other hand, if the exclusion is disjunctive, then an insurance policy purporting to cover intentional acts no longer does so. In addition, Heileman argues that to interpret the exclusion as has the district court eliminates all coverage for any kind of discrimination from the policy. Finally, Heileman argues that when one interpretation favors the insured and the opposite interpretation favors the insurer, the rules of insurance policy interpretation dictate that the insured be favored. Especially is this true in a case such as this one, where the Calumet lawsuit is of a type common in the industry and thus, reasonably foreseeable by both Heileman and Federal. *See Anheuser–Busch,* 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385; *Lake County Beverage,* 441 N.E.2d 1008.[10]

Federal sees no pattern in the use of the semicolon in place of "and" or "or" and believes that viewing the policy as a whole dictates that the semicolon be read as if it were an "or." Federal also notes that each subpart begins with the word "when" and argues that this indicates each is an independent condition. If the subparts were conjunctive, Federal argues, the "when" would have immediately followed "except." Finally, Federal argues that there are other places in the policy where a semicolon must be read as "or" for the policy to make sense and that this fact refutes Heileman's argument. For example, the "personal injury" definition contains the alphabetic subparts separated by semicolons. Each semicolon must act as an "or" for the policy to make sense. Otherwise coverage for personal injury would require the allegation of three forms of injury in every claim (e.g., false arrest *and* libel *and* humiliation).[11] Federal also believes that the exclusion applies to the acts alleged in Calumet's suit because those allegations presume Heileman's intent to discriminate through its pricing structure, and the setting of prices is necessarily a conscious decision which must take place with Heileman's knowledge and consent.

But we need not consider Federal's arguments in detail because, as drafter of the policy, Federal chose what punctuation to use in this exclusion. Had Federal intended to definitively establish two independent exclusions it could have done so through the use of a period or an "or." Instead, Federal used a

tences." This is not the construction Heileman is arguing. In no way does Heileman assert that every semicolon in the policy is followed either by an "or" or nothing. Heileman merely points out that in a particular type of construction (alphabetic lists with subparts of numeric lists) the semicolon use is consistent and meaningful.

**10.** Federal's brief implies that price discrimination suits are common, as the following excerpt indicates:

The "price" of an item includes any discounts or other terms or conditions that may result in discrimination, such as rebates, free goods, and discriminatory freight allowances. *Centex–Winston Corp. v. Edward Hines Lumber Co.,* 447 F.2d 585 (7th Cir.1971); *Fowler Mfg. Co. v. Gorlick,* 415 F.2d 1248 (9th Cir.1969).

Forms of price discrimination that are likely to give rise to litigation (other than simple

arbitrary price differences between different purchasers) are based on volume, quantity and functional discounts. Volume and quantity discounts, if available, must be offered equally to all customers and must be practically available to all customers. *Fed. Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

Federal Br. at 19–20.

**11.** The definition reads (emphasis removed):

Personal Injury Means
  a. false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution;
  b. libel, slander, defamation of character, or invasion of the rights of privacy, unless arising out of advertising activities;
  c. humiliation or discrimination....

lone semicolon. The semicolon can be read as an "or" or as an "and," in both cases creating a grammatically logical sentence. This ambiguity alone is sufficient to support a conclusion that the semicolon should be construed to operate as an "and." We therefore decline to examine further the parties' grammatical and usage arguments with respect to semicolon placement.

Even were the exclusion not ambiguous, however, we could not find that it applies. Acts done with "knowledge and consent" are intentional. Yet the coverage for discrimination is coverage for Heileman's *intentional* acts. If Federal's interpretation of the exclusion were correct, the policy would simultaneously promise to cover and to refuse to cover Heileman's intentional discrimination.

The policy limits "occurrences" of "bodily injury" and "property damage" to those injuries "neither expected nor intended from the standpoint of the insured." Policy at 17. The policy does not similarly limit "personal injury" caused by an "offense." "Personal injury" and "advertising injury" policies regularly cover intentional acts. *See, e.g., Indiana Ins. Co. v. North Vermillion Community Sch. Corp.,* 665 N.E.2d 630, 634 (Ind. Ct.App.1996) (suit alleging intentional libel or slander generated duty to defend under personal injury policy). Thus the "personal injury" coverage includes intentional acts. If subpart (2) of the exclusion were interpreted to operate independently, all coverage for intentional acts is extinguished. The exclusion reads "discrimination EXCEPT: ... (2) when committed by or with knowledge or consent of the insured." Policy at 18. This could be re-written: coverage for

"discrimination EXCEPT: ...

when committed by [the insured] or with knowledge [of the insured] or consent of the insured."

Thus stated, no intentional action of the insured would remain covered by the policy.[12] Therefore, the semicolon in question must be interpreted as an "and."

We now consider whether reliance on the exclusion must be rejected on other grounds as well. Heileman argues that because Federal delayed six months before notifying Heileman of its wrongful decision to decline to defend, Federal now should be barred from denying coverage based on an exclusion. *See Indiana Ins. Co. v. Ivetich,* 445 N.E.2d 110, 112 (Ind.Ct.App.1983) ("when an insurer induces the insured to effect self-help to protect himself, it cannot then hide behind the language of the insurance policy to avoid its duty to defend or insure.") (citing *American Family Mut. Ins. Co. v. Kivela,* 408 N.E.2d 805 (Ind.Ct.App. 1980)). In *Ivetich* the insurance company refused to pay a claim on the grounds that the claims alleged were not covered. Similarly, in *Kivela* the insurer denied both coverage and a duty to defend. Because the insurance companies in both cases wrongfully denied coverage, the Indiana courts held that the insurer could not then "hide behind the language of the contract in an attempt to avoid its duty to insure." *Id.* In other words, choosing to deny coverage based on non-coverage by the insuring clause, thus leaving the insured to fend for itself, bars the insurer from recourse to its exclusions. Thus, regardless of whether the exclusion would apply in another circumstance, Federal may not now rely on it.

The grant of summary judgment is

REVERSED.

FLAUM, Circuit Judge, dissenting.

The majority informs us that "time was" when " 'discrimination' might have brought immediately to mind charging one person

**12.** Heileman argues that the district court misquoted the policy language: "The court instead drops the word 'by' following the word 'committed' to make over the wording to read 'committed with knowledge or consent of the insured.' The court's redrafting is remarkable for its indifference to the actual insurance wording." Heileman Br. at 38. We caution Heileman against impugning the work of the district court on what appear to be specious grounds. We find the alleged misquotation nowhere in the district court's opinion. We find instead two completely accurate quotations, Memo. Op. at 11, 12, and two quotations mistakenly inserting the word "the." Memo. Op. at 13 ("with *the* knowledge or consent of the insured") (emphasis supplied to indicate incorrect word). This mistake is hardly as indifferent to the actual language (or as devious) as Heileman would have us believe.

more than another for the same product." *See Maj. Op.* at 564–565. However, as the majority acknowledges, the meaning of "discrimination" that is likely to come to mind today (Heileman's policy covered the years 1992–1994) is the differential treatment of persons on the basis of some personal characteristic, such as race, age, sex, handicap, or nationality—not the pricing of one's products in a manner injurious to competition. In my judgment, this "plain and ordinary meaning" should not be set aside. *See Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992). Nor should the context in which the word "discrimination" is used in the policy, as both shed light on the intent of the parties to this contract. *See Monroe Guar. Ins. Co. v. Campos*, 582 N.E.2d 865, 870 (Ind.Ct.App. 1991). It is, after all, the parties' intent that this court must "ascertain and enforce." *See id.* Because I am unable to conclude that Federal intended to provide (or that Heileman believed it had purchased) coverage for price discrimination claims, I respectfully dissent.

In interpreting insurance contracts, courts are frequently called upon to choose between a narrow and a broad construction of a policy provision. Due to the interpretive tool of construing contracts against the drafter, the broad interpretation is often the favored one. "However, this rule does not require ... court[s] to abandon all common sense, and blindly afford coverage where it is questionable that any coverage was so intended." *Town & Country Mut. Ins. Co. v. Owens*, 143 Ind.App. 522, 241 N.E.2d 368, 370 (1968) (holding that "journey of seventeen blocks from one part of a small town to another was not a 'trip,'" despite fact that dictionary defines "trip" as "going from one place to another"). When construing insurance contracts, courts must bear in mind the "traditional caveat that in choosing between a broad or narrow construction of a word or phrase the choices are limited to the *reasonable* interpretation of the term as used."

*Aetna Cas. & Sur. Co. v. Crafton*, 551 N.E.2d 893, 895 (Ind.Ct.App.1990) (emphasis in original).

The "as used" caveat is important. The word "discrimination" which we are asked to interpret is not written on a blank page; it is part of an insurance contract. As used in this policy, the word "discrimination" cannot reasonably be given the expansive construction the majority suggests. The term appears in the following definition of "Personal Injury."

> a. false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution;
>
> b. libel, slander, defamation of character, or invasion of the rights of privacy, unless arising out of advertising activities;
>
> c. humiliation or *discrimination* ....

(emphasis added). An examination of this definition reveals that related claims have been grouped together in subsections. I find it significant that the term "discrimination" has as its companion "humiliation"[1] (rather than say "price-fixing" or even "unfair competition"). As we explained in a similar context, "[a] word sometimes picks up meaning from its neighbors." *See Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1124 (7th Cir.1994) (holding that "unfair competition" should not be interpreted "as broadly as it might be interpreted in the law of business torts" because "all the other terms in the list of wrongs insured under the rubric of 'advertising injury' involved the misuse of information"). "Discrimination" (when given its plain and ordinary meaning) and "humiliation" are both claims involving the prejudicial or unfavorable treatment of persons. In my view, a straightforward reading would suggest that an antitrust claim arising from uncompetitive pricing practices is not the type of claim for which this contract language was designed to provide coverage. In focusing on whether

---

1. The majority chooses not to discuss the context of the word "discrimination" within the contract by concluding that Federal has failed to argue this point on appeal. By my reading, Federal's argument that a reasonable person would not interpret "discrimination," *as used in its policy,* to include "price discrimination" sufficiently preserves this issue. In any event, nothing, including the district court's rejection of this argument, precludes this court from taking note of the placement of the disputed term within the contract, as our review of this legal issue is *de novo.*

"price discrimination" is cross-referenced in the definition of "discrimination" in *Black's Law Dictionary*, the majority appears to have lost sight of the proverbial forest; namely, whether the parties, *through this particular provision*, intended to provide coverage for price discrimination claims.

As this court's decision in *Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119 (7th Cir.1994), demonstrates, courts must look beyond dictionary definitions of policy terms. The issue in *Curtis–Universal* was whether a policy that indemnified the insured against claims arising from "unfair competition" covered claims alleging violations of the antitrust laws. This court found that, although "unfair competition" has been interpreted broadly "to encompass everything forbidden by federal antitrust law and then some," this broad interpretation could not have been intended by the parties. *See id.* at 1123. Looking to the context in which the term was used, and relying on a measure of common sense, the court concluded that

> the broad interpretation cannot be right for the insurance policy in our case. It would turn insurance against liability for "advertising injury" into insurance against liability for antitrust violations, provided only that the violations arose out of the insured's "advertising activities".... As far as we have been able to determine, insurance companies· will not insure against liability for antitrust violations.... [W]e find it highly implausible to suppose "unfair competition" in a list of torts otherwise concerned mainly with harmful speech in various forms (defamation, invasion of the right of privacy, copyright infringement) would sweep under the policy a general, albeit prima facie, liability for antitrust damages.

*Id.* Given that insurance coverage is not typically provided for antitrust damages, it seems too facile to conclude that, merely because the pricing practice forbidden by the Robinson–Patman Act is fortuitously referred to as "price discrimination" (rather than say "price differentiation"), coverage was intended in the instant case. This is especially true when, as in *Curtis–Universal*

and in the instant case, the context in which the disputed term appears further suggests that a narrower reading of the policy is appropriate.

Nor can I agree with the majority that finding coverage for antitrust claims under this provision is in accord with the reasonable expectations of the parties. The majority reasons that, because price discrimination claims are common within the beer industry, Heileman would have reasonably believed that it was purchasing coverage for this type of claim. I submit that the more plausible assumption, given that these claims are not uncommon, is that the parties would have addressed the issue of antitrust coverage in a more direct manner if they had in fact intended to do so. One would expect recurring claims to be addressed with a certain degree of precision and clarity. Relying upon the placement of the phrase "humiliation or discrimination" in the "Personal Injury" section of the policy is a highly unusual, if not obtuse, means of indemnifying one's company against antitrust suits of this nature.

Finally, the very nature of personal injury coverage counsels against "shoehorning" Heileman's price discrimination claim into the personal injury section of this policy. As one commentator has explained,

> [u]nlike most liability coverages, which are written in broad, all-risk language, advertising injury coverage (and personal injury coverage ... ) are both specified risk coverages. The policy terms are designed to provide coverage for the enumerated claims only and not to provide generalized liability coverage.... A highly attenuated connection to advertising is not sufficient to create coverage. Thus, for example, courts have been reluctant to consider patent or copyright infringement claims as falling within advertising injury coverage merely because the allegedly infringing good was advertised, a view that makes sense.

Jeffrey W. Stempel, Interpretation of Insurance Contracts § T9.2, at 158 (1996 Supp.). For this reason, courts in general "have taken a relatively strict view of the [personal injury] coverage, reading the enumerated items strictly and construing other actions

according to their synonymousness or 'fit' with covered torts." *Id.* at 163. That Federal's policy is an "umbrella" policy does not change the limited nature of personal injury coverage. While certain umbrella policies undoubtedly serve the purpose of filling "unanticipated gaps" and shifting "away from the insured the burden of choosing the risks to which the insured remains exposed," *see Maj. Op.* at 567, the personal injury coverage at issue in this case provides primary liability coverage for certain enumerated claims only. Because I cannot find "price discrimination" among these enumerated claims, I would affirm the judgment of the district court granting summary judgment in favor of Federal.[2]

2. Having concluded that Federal's policy does not cover Heileman's claim, I express no opinion regarding the majority's analysis of the policy's exclusionary provision.